THE AMERICAN EXCHANGE NATIONAL BANK *v.* THE GEORGIA CONSTRUCTION AND INVESTMENT CO. *et al.*

1. Where, in order to have a note discounted at bank, a partner indorsed it in his own name and also in the partnership name, and the undisputed evidence shows that the bank would not make the discount and advance the money without the latter indorsement, there was no ground in the evidence for charging the jury as to what was the effect of the transaction if it was based on the credit of the one partner only. And this is so although the bank knew that before the partnership indorsement would be binding on the firm, ratification by the other partner would be essential.

2. An indorsement in the partnership name to raise funds for the indorsing partner or for a third person will not bind the partnership without ratification (the bank discounting the paper knowing such ratification to be necessary), although the funds be entered in the bank books to the credit of the partnership and afterwards drawn out on checks of the partnership signed by the partner not privy to the transaction. The execution of such checks without notice that the funds were raised on the partnership credit, or by an indorsement in the partnership name, will not amount to a ratification. But if the proceeds of such checks, or some of them, be used for the benefit of the partnership, and any of them be retained after notice of the material facts has been acquired, this will be a ratification, no offer being made to return them.

3. If, after acquiring such notice and after a dissolution of the partnership, the partner informs the bank in writing that he has bought out his copartner's interest and will pay the notes of the firm, as he has assumed the firm's liabilities, the *prima facie* effect of such writing is to ratify the indorsement; but the writing is ambiguous, and is open to explanation by extrinsic evidence as to whether there was an intention to ratify the indorsement or not.

July 20, 1891.

Indorsement. Partnership. Ratification. Notice. Charge of court. Evidence. Before Judge Eve. City court of Richmond county. May term, 1890.

Action on a promissory note, by the bank against the construction company as maker, and R. P. Sibley *et al.* as endorsers. The note was signed by the construction company by R. P. Sibley president, and was endorsed by Penland, the payee, and three others, and after them by R. P. Sibley and R. P. & G. T. Sibley. The verdict was in favor of the plaintiff against the construction company as maker and R. P. Sibley as endorser, and in favor of G. T. Sibley. The plaintiff's motion for a new trial as to G. T. Sibley was overruled. The 3d and 4th grounds of the motion assigned errors upon the following portions of the court's charge:

"If the jury find that the money was loaned on the credit of R. P. Sibley, a member of the firm, even if the money has been used and applied to partnership purposes, it would be considered as an advance by R. P. Sibley to the firm, and he would become the firm's creditor. The bank would have to look to him and he to the firm. I give you that in charge subject to what I have already given you. If the credit was given to the firm, and this account passed to their credit, and they got the benefit of it and used it, then the firm would be liable; but if it was not for their benefit, but was given to R. P. Sibley individually, then he alone would be liable.

"The burden of proving ratification is upon the plaintiff, and they must satisfy you of such ratification by a preponderance of the testimony. Knowledge of the material facts of the endorsement must be shown to have been had by Grigsby T. Sibley, before he can be held to have ratified the endorsement; and mere knowledge of facts which themselves would not have informed him but which, followed up by inquiry, could

have led to knowledge of the real facts, will not be sufficient to sustain the charge of ratification."

J. B. CUMMING and BRYAN CUMMING, for plaintiff.

J. R. LAMAR, for defendant.

BLECKLEY, Chief Justice.

1. The charge of the court excepted to in the 3d and 4th grounds of the motion for a new trial was based on the hypothesis that the money might have been loaned on the credit of R. P. Sibley. No such hypothesis arises out of the evidence. On the contrary, the only testimony on the subject, that of the vice-president of the bank, was express that the bank refused to discount the note, unless it was first indorsed by the firm of R. P. & G. T. Sibley and passed through their regular account; that the note was discounted upon the credit of the indorsements and the bonds deposited as collateral security; that when first offered for discount the indorsement of R. P. & G. T. Sibley was not on the note; and that the bank never agreed to discount it until their name was indorsed on it, but expressly refused to do so, in consequence of which refusal the note was indorsed by R. P. Sibley in their name. Moreover, the money was entered to their credit in the books of the bank, and so stood until it was drawn out on checks signed in the firm name by G. T. Sibley. True the bank knew that the indorsement of the firm was an accommodation indorsement and that the ratification of it by G. T. Sibley was necessary, but it was expected that such ratification would take place and the indorsement be made effectual. This being so, the charge of the court was error, and whilst this error might have been harmless, it may, on the other hand, have been hurtful. In view of all the facts of the case and the finding of the jury, we consider it cause for granting a new trial.

2. Uncle and nephew were copartners under the name of R. P. & G. T. Sibley, as cotton factors in Augusta, Ga.

The partnership did business with the American Exchange National Bank of New York, and its dealings with that bank ran through a considerable time and embraced many transactions. R. P. Sibley, the senior partner, was president of the Georgia Construction & Investment Company. That company by him as president executed a promissory note for $5,000, dated Augusta, Ga., August 15th, 1888. It was payable at the American Exchange National Bank, New York, to the order of W. H. Penland, and due December 1st after its date. This note, bearing the indorsement of the payee and several others, the last of whom was R. P. Sibley indorsing as an individual, was offered by him to the bank for discount. The bank declined to discount it without the partnership indorsement also, and even with that indorsement would discount it only upon condition that the money should be entered to the credit of the partnership and pass through its account on the books of the bank. The bank officer knew that the indorsement was for accommodation and that, to render it binding on the partnership, the ratification of the junior partner would be necessary. This ratification the uncle promised to procure, and the bank discounted the paper on the 24th of August, 1888. By letter addressed to the partnership at Augusta, the bank communicated information at once that the note of the construction and investment company had been discounted and the firm credited with the proceeds. R. P. Sibley, also as president, by a letter similarly addressed, gave information to the firm that the bank had discounted the note "and placed to your" (credit). Both of these letters disclosed the amount of the note and the name of the maker, but neither of them gave any further description of the instrument or mentioned any of the indorsements or indorsers.

It is altogether improbable that any fraud was in-

tended by the bank on the partnership. It expected actual knowledge of the indorsement to be communicated by the partner who was present to the one who was absent. Moreover, it refused to subject the avails of the indorsement to the order of any one save the partnership. It retained the fund as partnership assets entered to the credit of the partnership in the partnership account with the bank, and did not afterwards pay out the money except on checks of the partnership, all of them, so far as appears, signed by the absent partner. No copy of any of the checks is in the record, but presumably they were not drawn upon any particular fund. They were some twenty in number and the aggregate amount covered by them was about $100,000, the balance to the credit of the partnership, at one time after this fund was entered to its credit, being run down to less than $20. It is manifest also that the avails of this indorsement passed through the partnership books as well as the books of the bank, for it appears that at the time the above mentioned small balance was stricken, the state of the account as kept by the parties respectively was the same; that is, the books of the partnership correspond with the books of the bank. On this state of facts, did the checking of the money out of the bank by the partnership, the checks being signed by the junior partner, constitute a ratification of the indorsement, irrespective of whether the partnership received the actual benefit of the fund, or whether that benefit was realized alone by the maker of the note, the Georgia Construction and Investment Company? Inasmuch as the bank was aware that the partnership indorsement was for accommodation, and that the junior partner was ignorant of it when it was made, the burden of proving that he afterwards assented to it would be upon the bank. Doubtless the fact that he checked out the money would be strong evidence of such assent;

indeed, quite enough evidence to charge him and the partnership with the indorsement. But if his own testimony is to be credited in opposition to the circumstantial evidence (and there is no legal reason why it might not be), it affirmatively appears that at the time the money was checked out he did not know of the indorsement. If he was then ignorant of it and believed that the credit of the firm had in no way been engaged to raise the money, it would seem that his ignorant co-operation in effectuating an arrangement between his copartner and the bank to transfer the money from the possession of the bank to that of the party for whose accommodation the indorsement when made was intended, ought not to render himself or the partnership liable. True the bank, before parting with the money, had fortified itself with a firm indorsement executed by one partner, and with firm checks executed by the other. But if these checks were issued by the junior partner without any knowledge or information of the indorsement, or any sufficient ground for believing that the note had been discounted on the credit of the firm, no assent to, or ratification of the indorsement could fairly be imputed to him. Whether, according to commercial usage and the general understanding of business men, the letter of the bank and that of the senior partner, written to the firm on the day the note was discounted, would communicate notice that the credit of the firm had been engaged in procuring the discount, would probably be a subject for expert testimony; but no such testimony appears in the record before us. In its absence, our conclusion is that checking out the money would not make the indorsement effective unless the partnership received the benefit of it either in whole or in part. But the receiving such benefit before notice and retaining it after notice, would operate as a ratification of the indorsement, whether so intended or not; for this

would be a ratification by conduct, that is, by checking out the money under a misapprehension, and failing to relinquish the fruits of the mistake after full discovery of all the means by which they were obtained. Whether by reason alone of checking out the money the indorsement should be operative or not, ought to depend in a large degree upon the equities between the parties.

To put the matter in a condensed form, let the partnership element be eliminated. If A without authority from B executes a promissory note in the name of the latter; sells it to C (who has notice of such want of authority at the time, but expects it to be supplied) and deposits the proceeds with C to the credit of B, and afterwards B, believing that the money had been raised by A on his own credit, checks it out and applies it to the use of A, it is clear that B is not bound to pay the note. But suppose B checks out the money and keeps it in his own pocket or appropriates it to his own use, he cannot hold on to the money and repudiate the note, assuming the transaction to be free throughout from any intention on the part of C to defraud. By retaining the money after knowledge that it was raised on his credit by an assumption of authority, B ratifies the act irrespective of whether he intends to ratify it or not. And as he cannot ratify in part and repudiate in part, such ratification will result from retaining any of the money with no offer to return the amount retained, although he may have paid out the residue for A's benefit before acquiring knowledge of all the material facts.

That the bank did not intend to perpetrate, or aid in the perpetration of, any actual fraud on the partnership, is fairly inferable; for it was understood that the senior partner was to inform his copartner of the transaction, and that the proceeds of the indorsement should be entered in the partnership account. This was equivalent to putting the title to these proceeds in the

partnership, there to remain until the partnership itself should draft them out of the bank and thus control their disposition. This afterwards took place, with what result on the finances of the partnership the record before us does not fully disclose. The state of the account between the firm and the Georgia Construction and Investment Company does not appear. As the firm actually drew this money from the bank on its checks, the junior member representing it in drawing the checks, it is *prima facie* chargeable with the whole sum. This partner says in his testimony that he "paid out some money for the Georgia Construction and Investment Company," and the brief of evidence contains this statement: "Agreed that the money was paid out a few days after August 24th, without communicating with the bank." Whether this means that all the money produced by the indorsement was so paid out, or whether it means that so much of it as the witness had previously referred to was so paid, we cannot determine. This is a matter which seems to need explanation.

3. The firm of R. P. & G. T. Sibley was dissolved by mutual consent on or about the 6th of September, 1888. Between that time and the 10th of September, probably on the 8th or 9th, G. T. Sibley, the junior member, received notice of the dishonor of this note. The notice, though expressed in very brief terms, sufficiently indicated that the firm of R. P. & G. T. Sibley was an indorser upon the instrument. On the 10th of September he wrote the bank that he had bought out the interest of R. P. Sibley in the firm and would continue the business in all its branches, adding these words: "The notes of R. P. & G. T. Sibley that you hold will be paid by me, as I have assumed the liabilities of R. P. & G. T. Sibley." As we understand the evidence, this letter was written and sent after notice to the firm had reached the writer that the note now in question was dishonored. He testified that he did not have,

when he wrote this letter, "any actual knowledge of R. P. & G. T. Sibley's indorsement on the note," but he does not deny that he had such information as the notice of dishonor communicated. Actual knowledge was not requisite to render the ratification of the indorsement resulting from his promise to pay the note effective. It was enough if he had such information as would raise the belief in his mind, or in the mind of a reasonable man, that the bank regarded the firm as an indorser upon the note and sought to hold the partnership liable as such. The phraseology of the letter is somewhat ambiguous, for the terms "the notes of R. P. & G. T. Sibley" may be restricted to notes of which they were the makers, or these terms may comprehend all notes held by the bank on which the firm name appeared, whether as makers or indorsers. Inasmuch as the letter states that the writer had assumed the liabilities of R. P. & G. T. Sibley, we think this more comprehensive sense is apparently the true signification of the doubtful words. But under the rule of our code as to allowing all ambiguities, whether latent or patent, to be explained, extrinsic evidence is no doubt ·receivable as to whether there was any intention to ratify this indorsement or not. The *prima facie* import of the letter is to recognize this note as one of the liabilities of the firm.

Whilst we rest the grant of a new trial directly on the 3d and 4th grounds of the motion, we think the general substance of the case calls for a more thorough and sifting investigation than appears to have been had. We have ruled upon the controlling questions indicated in the motion for a new trial; and as the evidence on the next trial may be materially different, we deem it unnecessary to deal more specifically than we have done with the several grounds of the motion.

*Judgment reversed.*