## 26102. LIBERTY MUTUAL INSURANCE CO. v. LIPSCOMB
### et al.

16

Decided May 15, 1937.   Rehearing denied June 18, 1937.

R. W. Smith Jr., Neely, Marshall & Greene, for plaintiff in error.

J. B. Jones, E. C. Brannon, Sam S. Harben, Bryan, Middlebrooks & Carter, contra.

Sutton, J.   Mrs. Claud Lipscomb brought suit against Liberty Mutual Insurance Company, Ed Chambers, and Dr. Cleveland Whelchel.   The petition as amended, omitting certain portions which were stricken on demurrer, alleged as follows:   She is the widow of Claud Lipscomb, who worked for the Chambers Lumber Company, and was injured about December 24, 1933.   Chambers Lumber Company held an insurance policy on its employees, issued by the Liberty Mutual Insurance Company, and Ed Chambers, who was president and general manager of the lumber company, took out the policy, a copy being attached to the petition as exhibit A. A short time after his death, she turned the remains of her husband over to an undertaking establishment of J. B. Vickers & Son, who were to prepare the body for burial.   The plaintiff went ahead making all arrangements for the funeral of her deceased husband. While the body was being prepared for interment, Ed Chambers, with Dr. Cleveland Whelchel, went to the undertaking parlors of J. B. Vickers & Son, and, without the knowledge or consent of plaintiff, proceeded to dissect the body of her deceased husband, cutting a large gash in his body, cutting and sawing his ribs loose from his breastbone, and otherwise mutilating his body, taking from the body the heart and other parts thereof; and Dr. Cleveland Whelchel, without the knowledge or consent of plaintiff, carried the heart to Atlanta and turned it over for dissection to a Dr. John Funke.   The heart was removed from her husband's body by Dr. Whelchel and taken to Atlanta at the instance of Ed Chambers, who was present and giving directions to Dr. Whelchel, and who was acting for and as a representative of the Liberty Mutual Insurance Company, which was located in Atlanta, and not in Hall County where the said mutilation took place; and the insurance company paid to Dr. Whelchel a fee for representing it in the premises.   The Downey Hospital was the designated examiner for

the insurance company, and the deceased, Claud Lipscomb, was first carried to said examiner, and Dr. J. H. Downey, the president of the hospital and the party and agent of the insurance company, gave the command to Ed Chambers to remove the heart of the deceased and take it to Atlanta, and the defendant insurance company ratified the action of Chambers and Whelchel by paying Whelchel and Dr. Funke for their services in performing the autopsy and mutilating the heart of Lipscomb. Dr. Funke was either specially or generally employed by the insurance company to examine and dissect the heart of the deceased, and he did dissect and mutilate it, all without the knowledge or consent of the plaintiff; and the insurance company, after being informed by Dr. Funke of his acts, paid him for his work, and thereby ratified what he did. The cause of her husband's death was well known and plainly to be seen, and it was unnecessary to have any autopsy on his body. No autopsy was called for by his employer, and the autopsy as held was at the instance of the insurance company, and was unauthorized in law and illegally done, and without the knowledge or consent of the plaintiff. The autopsy was cruel and inhuman, in that the body was unnecessarily disfigured and mutilated and separated and could not be buried together in a decent manner; all of which was in reckless disregard of plaintiff's rights, and embarrassing and humiliating to her. The heart of the deceased in some way came into the possession again of Dr. Whelchel, who said nothing to the plaintiff about it, but kept the heart in his possession until about May, 1935, when the plaintiff learned for the first time that he was in possession of it. She then made demand for it, and Dr. Whelchel turned it over to her, and she had it buried in the grave with her deceased husband. She knew nothing about the cutting and mutilation of her husband's remains until March, 1934, when for the first time she learned about the desecration of his body. For the cutting and mutilation of the body by Dr. Whelchel he was paid a fee by the insurance company, who had Ed Chambers make the employment of Dr. Whelchel. Ed Chambers and Dr. Whelchel and the insurance company confederated and conspired to mutilate and dissect the body including the heart, without any regard for the plaintiff's feelings, and at a time when she was in deep bereavement because of the death of her husband; all to the injury and damage of the plaintiff; and they thus trespassed on

her rights. The insurance company not only paid Dr. Whelchel for his services rendered before the death of plaintiff's husband, but for cutting up and mutilating his heart and carrying it to Atlanta; and also paid Dr. Funke for dissecting the heart and parts of the body. The parties defendant confederated to perpetrate these wrongs, and caused the plaintiff great suffering, mortification, and wounded feelings; and that she has thus been injured and damaged in the sum of $25,000, for which judgment is prayed.

The insurance company filed general and special demurrers, which were overruled, except that the court struck certain portions of the first amendment to the petition, which are not included in the foregoing statement of facts. To the overruling of the remaining grounds of demurrer the insurance company excepted, and they are dealt with in the following opinion.

■ In the present case the insurance company filed numerous and extensive special demurrers which attacked practically all of the allegations of the petition, on grounds that the respective allegations were irrelevant and immaterial, stated conclusions without supporting facts, or were too general, vague, indefinite, and uncertain, with one or two other grounds. These special demurrers have had the careful and painstaking consideration of this court, having in mind the obligation of the plaintiff to set forth her case plainly and distinctly; but, except as discussed below, the allegations are not subject to the objections made, and are sufficient to enable the defendant properly to prepare its defense. We might state, however, with respect to the special demurrer on the ground that the allegations of conspiracy add a distinct and separate cause of action to that seeking recovery on the ground of the damage done to the plaintiff because of the alleged unauthorized mutilation and dissection of her deceased husband's heart, that "Where civil liability for a conspiracy is sought to be imposed, the conspiracy of itself furnishes no cause of action. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the damage thereby done." *Woodruff* v. *Hughes*, 2 *Ga. App.* 361 (58 S. E. 551); *Wall* v. *Seaboard Air-Line Railway*, 18 *Ga. App.* 457 (2) (89 S. E. 533). It was further said, in *Woodruff* v. *Hughes,* supra: "Conceding, then, that an averment that the acts alleged were done in pursuance of a conspiracy does not change the nature of the action or add anything to its legal effect, the allega-

tion and proof of conspiracy is important to the action only because it will enable the plaintiff to recover his damages against such of the defendants as may be shown to be guilty of the tort, even should he fail to prove a conspiracy or concerted design; and it may be pleaded and proved as aggravating the wrong of which the plaintiff complains and to enable him to recover against all the defendants as joint tort-feasors. If the conspiracy can be proved, the party wronged may look beyond the actual participants committing the injury and join with them as defendants those who conspired to accomplish it." While the allegation of conspiracy may well serve the purpose dealt with in the above-quoted language, it does not of itself constitute a cause of action.

■ To the allegation that "plaintiff charges and alleges that the said Ed Chambers, Dr. Whelchel, and the Liberty Mutual Insurance Company confederated and conspired together to mutilate and dissect the body of her said husband, including his heart, and without any regard to your petitioner's feelings," etc., the insurance company specially demurred on the ground that, being a corporation, it could not be a party to a conspiracy, or a conspirator, and that the corporation itself could not conspire with the other defendants alleged by inference to have been acting for it. The name "Liberty Mutual Insurance Company" imports a corporation, and must be so treated for the purpose of the special demurrer. A corporation obviously could not conspire, except through some person authorized to represent it. No allegation is made except that the corporation conspired, and in the absence of proper amendment the paragraph quoted should have been stricken on special demurrer.

■ The petition alleged that the "Liberty Mutual Insurance Company not only paid Dr. Whelchel for services rendered before the death of petitioner's husband, but for cutting up and mutilating the heart of petitioner's husband," etc.; and the company specially demurred to the allegation with respect to the services rendered before the death of the plaintiff's husband, on the ground that it was irrelevant and immaterial and illustrated no issue presented by this suit for damages on account of acts alleged to have been done by the defendants after the death of her husband. This ground should have been sustained, for the reason urged.

■ To the allegation "that said parties confederated together

to perpetrate the great wrong to her and caused her great suffering, mortification and wounded feelings," etc., the insurance company specially demurred on the ground, among others, that the allegation was too general, vague, indefinite, and uncertain, in that the manner in which they confederated was not set out. As shown above, a corporation can not act except through some properly authorized agent; and the allegation failing to set out who acted for such corporation in the alleged conspiracy, this ground should have been sustained.

To the allegation in the first amendment, that the cause of her husband's death was well known and plainly to be seen, the insurance company specially demurred on the ground, among others, that it was only a conclusion of the pleader, without any supporting facts either in the amendment or the original petition. This ground also was good, and in the absence of proper amendment the allegation should have been stricken.

The plaintiff seeks to set out a cause of action for damages caused to her by the alleged illegal acts of Ed Chambers, Dr. Whelchel, and the insurance company, in mutilating and dissecting the body and heart of her deceased husband. The insurance company filed general demurrers to the petition as amended, on the grounds (a) that no cause of action is set out against it, and (b) that the facts set forth, as finally amended, do not entitle the plaintiff to recover damages against it. The original petition charged, that, after the death of the plaintiff's husband, Ed Chambers and Dr. Whelchel went to the undertaking establishment where she had sent the remains, and, without her knowledge or consent, removed the heart and other parts of the body, and that Dr. Whelchel, without her knowledge or consent, took the heart to Dr. Funke in Atlanta for the purpose of dissection; that such procedure was at the instance of Ed Chambers, "who was present and giving directions to Dr. Whelchel, and who was acting for and as a representative of" the insurance company. In response to a special demurrer, the plaintiff amended her petition by alleging that "the Downey Hospital was the designated examiner for the Liberty Mutual Insurance Company, and that the deceased, Claud Lipscomb, was first carried to said examiner, and that Dr. J. H. Downey [was] the president of the said Downey Hospital, and the party and agent of defendant insurance company who gave the command to Ed Cham-

bers," as previously alleged. It had been alleged by amendment that the action and conduct of Ed Chambers were brought about by and through a direct command of the insurance company to mutilate the body and remove the heart and carry it to Atlanta, and that after being informed of the action of Chambers the insurance company ratified the action of Chambers and Dr. Whelchel. The court sustained a special demurrer thereto, with the right of the plaintiff to amend; but the only amendment as to the appointment of Chambers was as set out above with reference to the act of the "designated examiner." It is not clear from the amendment whether the plaintiff intended to allege that the Downey Hospital was the designated examiner and the party and agent of the insurance company and gave the command to Ed Chambers to employ Dr. Whelchel, or whether Dr. Downey, the president of the hospital, was the designated examiner and personally gave the command. Suffice it to say, the most that can be implied from the language used is that the designated examiner was the source of Ed Chambers' purported authority to employ Dr. Whelchel for the purpose of dissecting the heart and body of the deceased Claud Lipscomb. There is no specific allegation that the designated examiner had been expressly delegated authority by the insurance company to do anything except to examine a living person. The right of the plaintiff to recover is to be determined by a consideration of whether or not a "designated examiner" of an insurance company has the right to make, by virtue of such agency, a dissection or mutilation of a dead body, or, if having such capacity, to authorize another to act in the premises. General averments must yield to specific allegations, and the facts alleged must themselves determine the scope of the agency. *Baggett* v. *Edwards,* 126 *Ga.* 463 (55 S. E. 250); *McClure Ten-Cent Co.* v. *Humphries,* 29 *Ga. App.* 524 (116 S. E. 54); *Daniel* v. *Excelsior Auto Co.,* 31 *Ga. App.* 621, 624 (121 S. E. 692).

In *L. & N. Railroad Co.* v. *Blackmon,* 3 *Ga. App.* 80, 82 (59 S. E. 341), it was held: "The unauthorized mutilation of the dead body of a husband gives a right of action to his widow. . . A surgeon, being sent by two railway companies to a wreck, to give professional attention to an engineer who had been injured, caused him to be moved to a hospital, where he soon died; after the death had occurred he ordered the body carried to an undertaker's estab-

lishment, and there he and the undertaker, without the consent of relatives, mutilated the corpse. *Held,* that the tort of the surgeon was not within the scope of the business for which he was employed, and that the railway companies were not responsible for the mutilation." It was said in the opinion: "Conceding that a surgeon of a railway company is such a servant as to be within the purview of section 3817 of the Civil Code of 1895 [Code of 1933, § 105-108] which provides that 'Every person shall be liable for torts committed by his . . servant by his command, or in the prosecution and within the scope of his business, whether the same be by negligence or voluntary,' still we can not hold that the tort complained of here was within the scope of the business for which the servant was employed. Whether the railway company furnished surgical attention to the engineer for the purpose of diminishing the effect of an injury for which they apprehended they might be held liable, or as a mere gratuity, the business entrusted to the surgeon *was that of ministering to a living man;* and when death had rendered all further ministration unavailing, the duty and business with which he had been entrusted by the railway companies were at an end. Certainly the limit to the scope of his authority was reached when he had closed the dead eyelids down and had delivered the body to him to whom next in natural order the corpse should go—the undertaker. A case might arise in which a railroad company would be liable for the mutilation of a dead body by a surgeon; as, when, for the purpose of obtaining evidence or for other reason, it directed an autopsy to be made. Such is not here alleged to be the case. The mere allegation that the person committing the tort was agent and surgeon at the time does not render any the less necessary the statement of facts showing that the act was by command of the employer or within the scope of the employment." (Italics ours.)

In Sudduth *v.* Travelers Ins. Co., 106 Fed. 822, it was said: "I do not think that one would ordinarily suppose that the word 'examine,' as applied to the human body, either living or dead, would ex vi termini include, or, by an insured at least, would be supposed to include, the idea of cutting it up. The word 'examine' may not definitely express the same idea to every person who sees it or who uses it, but it is quite clear to me that it does not, in the clause of the contract we are considering, include the idea either

of an 'autopsy' or of a 'dissection,' if there is any essential difference between those two words in this connection." In Travelers Ins. Co. *v.* Welch, 82 Fed. (2d) 799, 801, in which was involved the right of the insurance company to make an autopsy in case of death of the insured, Judge Sibley said: "'The right to examine the person of the insured mentioned in the first clause of the quoted policy provision, if applicable after death, does not cover mutilation by dissection." There is no allegation in the petition in the present case that the "designated examiner," whether the hospital or Dr. J. H. Downey, had been entrusted with any right to order a dissection. There is no allegation that the insurance company was in any way interested in having the hospital, Dr. Downey, Chambers, or Whelchel bring about an autopsy or dissection for the purpose of obtaining evidence or for any other reason. Plainly, whatever instructions were given Ed Chambers by the "designated examiner" were beyond any authority reposing in the examiner as such. But it is alleged that (a) the autopsy was held at the instance of the insurance company; (b) it paid Dr. Whelchel a fee for representing it in what he did, and (c) it ratified the action of Dr. Whelchel by paying Dr. Whelchel and Dr. Funke for their services in performing the autopsy and mutilating the heart of the deceased Lipscomb. These allegations were made, it is to be assumed, with a view of establishing liability on the part of the insurance company under a theory of ratification. The general averment that the autopsy was held at the instance of the insurance company must, however, yield to the allegation of the particular fact that it was the designated examiner that ordered the dissection, and, as we have seen, the insurance company was not bound by what the examiner did in that respect. It remains to be determined, therefore, if under the theory of ratification the insurance company is liable because of the allegation that it ratified the action of Chambers and Dr. Whelchel by making the payments referred to. "As a general rule, in order that a ratification of an unauthorized act or transaction may be valid and binding, it is essential that the principal have full knowledge, at the time of the ratification, of all material facts and circumstances relative to the unauthorized act or transaction, or that some one authorized to represent the principal, except the agent, have such knowledge, unless the principal is wilfully ignorant or purposely refrains from

seeking information." 2 C. J. 476, § 93. "But an intention to ratify may often be presumed by the law from the conduct of the principal, and that presumption may be conclusive, even against the actual intention of the principal, where his conduct has been such that it would be inequitable to others to permit him to assert that he has not ratified the unauthorized act of his agent." 2 C. J. 492, § 112. "By ratification of a tort committed for one's benefit, the ratifier becomes liable as if he had commanded it; otherwise, if the act was done for the benefit of a third person." Code, § 105-109.

In *Roberts* v. *Bank of Eufaula,* 20 *Ga. App.* 221, 226 (92 S. E. 1015), it was said: "It is not requisite to the ratification of an unauthorized act of one assuming to act as the agent of another that the acquiescence should be in express terms. In most cases such a ratification can be implied from the acts and conduct of the principal. As a general rule, if the principal, with full knowledge of all the material facts, accepts and retains the benefits of the unauthorized act, he thereby ratifies the act. Of course, as stated, ratification necessarily implies complete knowledge of all the material facts relating to the transaction." See also *Butler* v. *Standard Guaranty &c. Co.,* 122 *Ga.* 371 (3) (50 S. E. 132) ; *Dolvin* v. *American Harrow Co.,* 131 *Ga.* 300 (8), 308 (62 S. E. 198). As to ratification by conduct without an express intention to ratify, it was said by Chief Justice Bleckley in *American Exchange National Bank* v. *Georgia Construction &c. Co.,* 87 *Ga.* 651, 657 (13 S. E. 505), where one partner made a loan, indorsing the name of the partnership, and the proceeds were placed in a bank to the credit of the partnership, and another partner checked out the money for the benefit of the partner making the loan: "By retaining the money after knowledge that it was raised on his credit by an assumption of authority, B ratifies the act irrespective of whether he intends to ratify it or not. And as he can not ratify in part and repudiate in part, such ratification will result from retaining any of the money with no offer to return the amount retained, although he may have paid out the residue for A's benefit before acquiring knowledge of all the material facts." But mere payment does not necessarily amount to ratification, as was illustrated in *Thompson* v. *Brown,* 121 *Ga.* 814 (49 S. E. 740), where a wife made a contract in her own name for the improvement of

her husband's house, and it was not shown that she was his authorized agent or that he knew of the work being done on his property, but afterwards paid for part of the work. It was there said: "The wife having acted on her own behalf, and not as the agent of her husband, he can not be held bound, as principal, by ratification, merely because he has paid for part of the work." There is not in the petition in the present case any allegation that either Chambers' or Dr. Whelchel's acts in regard to the autopsy and dissection were for the benefit of the insurance company. There is no allegation that it had any knowledge of what they were doing. It is alleged only that by paying Dr. Whelchel and Dr. Funke it ratified what Chambers and Dr. Whelchel had done. Under the above authorities setting out the law of ratification by intention to ratify, as well as ratification by conduct, it can not be said that the insurance company ratified their acts. For that reason, and because neither Downey Hospital, Dr. J. H. Downey, Ed Chambers, nor Dr. Whelchel was shown to be authorized to act for the insurance company in the matter of the autopsy or the dissection, the petition did not set out a cause of action against the insurance company so far as their acts are concerned.

However, a cause of action was set out against the insurance company by the allegations with respect to the work done by Dr. Funke and the other allegations in connection with it. It is set out that he was either specially or generally employed by the insurance company to examine and dissect the heart of the deceased husband of the plaintiff; that he did dissect and mutilate the heart without her knowledge or consent; and that the insurance company, after being informed of what he had done, paid him for his services. The averment as to Dr. Funke's employment stated a traversable fact rather than a mere conclusion. Dr. Funke, if employed by the insurance company, whether specially or generally, to dissect the heart of a dead body, would certainly be acting in the scope of his employment if he did what he is alleged to have done in the present case. It was alleged that he was employed to dissect this particular heart, and it matters not that he received the heart from one who had not been authorized to bring it to him. According to the petition, he did dissect it. He thereafter made known to the insurance company that he had done so. The allegation that he was paid for his work, aside from any question of

ratification, lends strength to the allegation of his agency, notwithstanding that, without the allegation that the company was notified of what he had done, mere payment would not of itself bind the insurance company. Under the allegations as made, we think that a cause of action was set out, and the court did not err in overruling the general demurrer to the petition as amended.

*Judgment affirmed in part and reversed in part.* *Stephens, P. J., and Felton, J., concur.*