**Gene H. LACY, Individually and as Administrator Ad Prosequendum of the Estate of Todd Lacy, Deceased and Gene H. Lacy and Jane Lacy, Plaintiffs,**

v.

**COOPER HOSPITAL/UNIVERSITY MEDICAL CENTER, Dr. Walter Broadnax, Dr. Sue McCoy, Dr. Robert Mirabile, Linda Sprout, and Dr. Mordicai Dunst and/or Veterans Administration Medical Center, Defendants.**

Civ. A. No. 86–3762(SSB).

United States District Court, D. New Jersey.

Sept. 5, 1990.

**1030**

Marc G. Brecher, Wapner, Newman & Associates, Philadelphia, Pa., for plaintiffs.

Jeanne A. Taylor, Dughi and Hewit, Mount Laurel, N.J., for defendant Dr. Dunst.

---

OPINION

BROTMAN, District Judge.

Presently before the court is a motion for summary judgment by defendant Mordicai Dunst, M.D. For the reasons stated herein, defendant's motion for summary judgment will be granted.

## I. FACTS AND PROCEDURE

### A. *Prior Proceedings*

Plaintiffs commenced a civil action for negligence and medical malpractice against Cooper Hospital/University Medical Center, Doctors Broadnax, McCoy, and Mirabile, and Nurse Sprout. During the course of discovery, plaintiffs' attorney obtained a letter written by Nurse Pauline Marra stating that an intern, defendant Dr. Dunst, had performed a procedure on plaintiffs' decedent, Todd Lacy ("Todd"), after he had been pronounced dead. Plaintiff's attorney then wrote a letter to plaintiffs telling them about Nurse Marra's letter.

On November 24, 1987, plaintiffs amended their complaint to include a cause of action against Dr. Dunst. Plaintiffs allege that Dr. Dunst "intentionally, recklessly, with deliberate indifference to the emotional sensitivities of plaintiffs' decedent's next of kin and without permission from plaintiffs' decedent's next of kin performed an invasive medical procedure known as a thoracentesis [1] by injecting a needle into plaintiffs' decedent's dead body." Third Amended Complaint, Fourth Cause of Action. Plaintiffs further allege that defendant's conduct "constituted a deviation from the standard of care reasonably to be expected of a physician in dealing with corpses and that it was reasonably foreseeable that such a deviation would cause emotional and substantial physical disability with respect to persons normally constituted, such as plaintiffs." *Id.*

On January 20, 1989, this court entered an order denying the motion of defendant Cooper Hospital/University Medical Center

---

[1.] Both parties agree that the procedure performed by defendant was mistakenly referred to as thoracentesis. The proper name for the procedure is pericardiocentesis.

to dismiss Count IV of plaintiffs' Third Amended Complaint. The court stated that plaintiffs' Fourth Cause of Action "alleges a cause of action for mishandling of a corpse and not for emotional distress as a result of the death of a loved one." The court noted that "New Jersey recognizes a cause of action for mishandling a corpse, see *Schwartz v. United Jersey Bank,* 497 F.Supp. 335, 338 ([D.N.J.] 1980); *Muniz v. United Hospitals Medical Center,* 153 N.J. Super. 79 [379 A.2d 57] (App.Div.1977)."

### B. *Facts*

Todd was admitted to Cooper Medical Center on December 14, 1985, with a diagnosis of bowel obstruction. The obstruction was surgically corrected and Todd was recovering satisfactorily. On December 30, at around 9:30 p.m., Todd complained of chest pains. At about 5:15 a.m., Todd was found unresponsive, cold and clammy, and without blood pressure or a pulse. A Code was called. Defendant, Dr. Mordicai Dunst, M.D., was among the doctors that responded to the Code.[2] Defendant had not had any prior contact with Todd. After efforts at cardiopulmonary resuscitation ("CPR") were unsuccessful, defendant performed three pericardiocenteses[3] on the patient. Defendant contends that the first pericardiocentesis yielded a white, milky fluid that is not expected to be found in the pericardial space. Brief In Support Of Motion For Summary Judgment On Behalf Of Defendant, Mordicai Dunst, M.D., at 2 ("Defendant's Brief"). Defendant performed another pericardiocentesis because he thought he had entered the stomach the first time. Defendant Dunst's Deposition at 100. The second pericardiocentesis yielded no fluid. Defendant's Brief at 2. Defendant concluded there was no fluid in the pericardial space and Todd was pronounced dead.[4] *Id.*

Defendant contends that he then "looked around and I noticed a bottle containing fluid that had the same appearance as the fluid" from the first pericardiocentesis; this led defendant to conclude that the first pericardiocentesis was, in fact, in the correct place and that the fluid he withdrew may have come from the heart. Defendant's Deposition at 100. As a result of this realization, defendant decided to do a third pericardiocentesis in the hopes that the withdrawal of fluid would stimulate Todd's heartbeat. *Id.* at 113. The third procedure yielded "a small amount of fluid, similar in appearance" to the first procedure. *Id.* at 102. Unfortunately, Todd's heart did not respond and the doctors in attendance pronounced Todd dead a second time. *Id.* at 103. Defendant admits that a nurse present in Todd's room during the Code told defendant, when he started the third pericardiocentesis, that he should not "practice" on the body.[5] He told her he was not practicing, but he did not stop and explain the situation to her because "[t]his was an emergency situation. In order to have explained exactly what I was doing would have taken some amount of time. That amount of time would have possibly prevented his resuscitation." *Id.* at 112–13. Defendant stated that he did not write anything down regarding any of the three pericardiocenteses, *id.* at 103, and there is no mention of the procedures in the chart summary. According to the Final Summary report by pathologist Susan Gisser, M.D.,

> [a]t autopsy the major finding was necrosis of the right ventricular apex with a pericardial effusion of white, turbid fluid, grossly not unlike the hyperalimentation fluid. There was a cellular reaction to this, indicating that puncture occurred prior to actual demise and that the cathe-

---

2. The pleadings and briefs do not provide any other information regarding the presence of other doctors during the Code.

3. Pericardiocentesis involves inserting a long needle into the pericardium, a sac surrounding the heart, to remove fluid that may be present and compressing the heart. Defendant's Brief at 1–2.

4. Defendant claims that Todd was pronounced dead by a "consensus." Defendant Dunst's Deposition at 98.

5. Defendant contends that he did not know the nurse in the room at the time and that to this day he does not know Nurse Marra. Defendant's Deposition at 103, 113.

ter tip was most likely delivering fluid directly into the pericardial cavity. Reply Brief to Defendant, Mordicai Dunst, M.D.'s Motion for Summary Judgment ("Plaintiff's Brief"), Exhibit 7. Defendant asserts that this finding shows that the first pericardiocentesis was done in the correct place and, thus, justifies his having performed the third pericardiocentesis. Defendant's Brief at 2 n. 2.

Plaintiffs paint quite a different picture of the events after the Code was called. Plaintiffs allege that defendant performed an "invasive medical procedure" on Todd after he was dead. Third Amended Complaint, Fourth Cause of Action ¶ 33. In other words, plaintiffs contend that defendant was "practicing" on Todd's already dead body. Plaintiffs base their belief on a letter they received from their attorney[6] regarding a letter Nurse Pauline Marra wrote to Dr. Carnahan. Defendant's Brief, Exhibit 4. Nurse Marra's letter primarily discussed her dissatisfaction with Dr. Broadmax's behavior toward Todd during the evening of December 30 and the morning of December 31. *Id.*, Exhibit 3. With regard to defendant Dr. Dunst, Marra wrote "After the man was pronounced, Dr. Dunst proceeded to perform a thoracentesis[7] even after I told him that it was unacceptable to practice on patients. He told me he was not practicing and was going to do it anyway!!" *Id.* She stated in her deposition that it is "unethical to be doing anything to a patient after he or she has been pronounced." Pauline Marra's Deposition at 12.

According to plaintiffs, defendant could not have been attempting to save Todd's life by a third pericardiocentesis because Todd already had no blood pressure or pulse when the Code was called, and CPR

and two pericardiocenteses had been unsuccessful. Plaintiff's Brief at 5. In addition, plaintiffs note that defendant spoke to Dr. Camishion, one of the attending physicians, about the third pericardiocentesis. *Id.* In his deposition, Dr. Camishion stated, "[defendant] said that in order to rule out every possibility as a cause of death, he wanted to be sure that the patient hadn't had a pneumothorax, and he did an aspiration to check the air, which is a perfectly acceptable medical procedure." *Id.*, Exhibit 11 (Deposition of Dr. Camishion at 131–32). Plaintiffs allege that this is evidence that Todd was already dead at the time of the third procedure.

Defendant contends that plaintiffs can prove no set of facts under which recovery for intentional infliction of emotional distress or for negligent infliction of emotional distress is available. Defendant is presently moving for a grant of summary judgment in his favor.

## II. DISCUSSION

### A. *Summary Judgment Standard*

■ The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the nonmoving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144,

---

**6.** The pertinent parts of the letter from attorney Brecher to his clients are as follows:

> we also recently obtained access to a letter prepared by Pauline Marra ... [the letter] also states that another physician performed a thoracentesis (a procedure which a needle is stuck into the chest of an individual) following Todd's death! I am appalled by this conduct. Such an invasive procedure should only be performed with the consent of the patient or his family. Of course, the consent

was not obtained by Dr. Dunst prior to performing this procedure.

> With your permission, it is also my intention to amend the Complaint to sue Dr. Dunst for this conduct.

**7.** In Nurse Marra's deposition she corrected the misdesignation of the procedures to indicate that Dr. Dunst had performed three pericardiocenteses and not thoracenteses. Deposition of Pauline Marra at 10.

79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

▮▮▮▮ Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring) (citing *Anderson,* 477 U.S. 242, 106 S.Ct. 2505, and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### B. *Mishandling a Corpse*

▮▮▮▮ Plaintiffs and defendant disagree as to what tort is at issue in this case. According to defendant, plaintiffs are proceeding based on intentional infliction of emotional distress or negligent infliction of emotional distress. Plaintiffs contend that they are trying to recover for the independent tort of mishandling a corpse. Plaintiffs assert that the order which this court issued on January 20, 1989 authorizes plaintiffs to proceed on a theory of mishandling a corpse only. The court's order noted that a cause of action for emotional distress as a result of the death of a loved one would not be an appropriate cause of action. The order does not, however, state that mishandling a corpse is a distinct tort.

▮▮▮▮ In fact, under New Jersey law, a plaintiff can recover for intentional or negligent infliction of emotional distress based upon the mishandling of a corpse, but mishandling a corpse is not a distinct tort. *See Strachan v. John F. Kennedy Memorial Hosp.,* 109 N.J. 523, 531, 538 A.2d 346, 350 (1988); W.P. Keeton, D. Robbs, R. Keeton, & D. Owens, *Prosser & Keeton on Torts* § 12 at 63 (5th ed.1984) [hereinafter "Keeton"]. In *Strachan,* the Supreme Court of New Jersey held that a hospital has a duty to act reasonably in honoring a family's legitimate request to turn over their dead son's body. 109 N.J. at 529, 538 A.2d at 349. The court embraced both intentional and negligent infliction of emotional distress when it noted that in situations concerning the handling of corpses, "the tort contemplates the *wrongful* infliction of emotional distress." *Id.* at 531, 538 A.2d at 350 (emphasis added) (citing Keeton § 12 at 63) ("there are a great many cases involving the mishandling of dead bodies ... Some cases [recognize] what is sufficiently obvious, that the tort is in reality merely the intentional infliction of mental distress").[8]

---

8. Plaintiffs cite a number of cases to support their contention that mishandling a corpse is a distinct tort under New Jersey law. In *Muniz v. United Hosps. Medical Center Presbyterian Hosp.,* 153 N.J.Super. 79, 379 A.2d 57 (App.Div.1977), parents sought damages against a hospital for its failure to locate their dead baby's body or confirm its death for three weeks. *Id.* at 80, 379 A.2d at 57–58. The Appellate Division of the Superior Court of New Jersey found that:

a claim for relief of emotional distress ... might be based on ... (3) conduct by the hospital that would warrant recovery for the tort of outrage; or (4) a deviation from the standard of care reasonably to be expected of a hospital in dealing with corpses and the reasonable foreseeability that such a deviation would cause emotional and substantial physical disability with respect to persons normally constituted.

*Id.* at 82, 379 A.2d at 58 (footnote omitted).

In *Schwartz v. United Jersey Bank,* 497 F.Supp. 335 (D.N.J.1980), the United States District Court for the District of New Jersey at-

█ Because the mishandling of a corpse is actionable only as a cause of action for intentional or negligent infliction of emotional distress, plaintiffs must satisfy the elements of either intentional or negligent infliction of emotional distress to survive a motion for summary judgment. New Jersey recognizes intentional infliction of emotional distress as an independent cause of action. *Hume v. Bayer*, 178 N.J. Super. 310, 317, 428 A.2d 966, 968 (Law Div.1981). *See also Polito v. Continental Casualty Co.*, 689 F.2d 457, 464 (1982); *49 Prospect Street v. Sheva Gardens*, 227 N.J.Super. 449, 471, 547 A.2d 1134, 1145 (App.Div.1988). Thus, a plaintiff does not need to rely on an underlying tort to recover for emotional distress. *Id.*

### C. Intentional Infliction of Emotional Distress

█ The New Jersey Supreme Court laid out the necessary elements for an action based on intentional infliction of emotional distress in *Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366–67, 544 A.2d 857, 863–64 (1988). The plaintiff must prove that the defendant's conduct was intentional and outrageous and that this conduct was the proximate cause of severe emotional distress. *Id.* at 366, 544 A.2d at 863 (citing M. Minzer, *Damages in Tort Actions*, vol. I, § 6.12 at 6–22 (1987)). *See*

*also Major League Baseball Promotion v. Colour-tex*, 729 F.Supp. 1035, 1055 (D.N.J. 1990). First, the defendant must have acted intentionally or recklessly; "defendant must intend both to do the act and to produce emotional distress" or defendant must have acted "recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." *Id.*

Second, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts, § 46 comment d (1965) [hereinafter "Restatement"] ). *See also Polito*, 689 F.2d at 464; *Figured v. Paralegal Technical Services*, 231 N.J. Super. 251, 255, 555 A.2d 663, 665 (App. Div.1989). The court must determine whether a defendant's conduct "may reasonably be regarded as so extreme or outrageous as to permit recovery." Restatement, § 46 comment h. The jury must then decide if, "in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.*

Third, the defendant's conduct must be the proximate cause of the emotional distress. *Buckley*, 111 N.J. at 366, 544 A.2d at 863.

tempted to interpret *Muniz*. The plaintiff in *Schwartz* sued a bank and two of its tellers alleging that they had conspired with federal and state officials to deprive plaintiff of his rights. *Id.* at 335. The court "suggest[ed]" that:

[*Muniz* ] does not create the tort of outrage or intentional infliction of emotional distress in New Jersey. Rather, the case recognizes that a hospital can be charged with negligence or malpractice if it callously or negligently handles the dead bodies of its former patients and that an element of damages may be the intentional infliction of emotional distress caused by such negligence or malpractice.

*Id.* at 338 (citations omitted).

Both *Muniz* and *Schwartz*, however, were decided before *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981), in which the Law Division of the Superior Court of New Jersey established intentional infliction of emotional distress as an independent cause of action, and before *Strachan*, in which the New Jersey Supreme Court found that an action based on the mishandling of a corpse is in essence an action for recovery for emotional distress. Although

the *Schwartz* court predicted that New Jersey would adopt intentional infliction of emotional distress as a distinct tort, it refused to interpret *Muniz* as establishing the tort since "subsequent New Jersey opinions which cite *Muniz* involve cases in which damages for emotional distress are permitted, not as a consequence of a new tort, but rather as a part of the damages recoverable upon the commission of a recognized tort or other wrong." *Schwartz*, 497 F.Supp. at 338. In addition, *Schwartz* was not concerned with corpses.

Plaintiffs also cite a 1936 case involving an improper burial where the court stated, "where ... a grievous injury to the feelings is reasonably certain to follow, that injury is presumed to have been intended, and the consequent mental suffering is compensable." *Spiegel v. Evergreen Cemetery*, 117 N.J.L. 90, 186 A. 585, 588 (1936). This court agrees that "grievous injury to the feelings," or emotional distress, due to mishandling of a corpse is compensable; however, it does not agree that such mishandling is actionable as a separate and distinct tort.

Lastly, plaintiff's emotional distress must be "so severe that no reasonable [person] could be expected to endure it." *Id.* at 366–67, 544 A.2d at 863 (quoting Restatement, § 46 comment j). Because this is a mixed question of law and fact, "the court decides whether as a matter of law [severe] emotional distress can be found, and the jury decides whether it has in fact been proved." *Id.* at 367, 544 A.2d at 864 (citing Restatement, § 46 comment j). *See also Decker v. Princeton Packet*, 116 N.J. 418, 430, 561 A.2d 1122, 1128 (1989).

■ Plaintiffs need not prove any physical injury to proceed on a theory of intentional infliction of emotional distress. *Hume*, 178 N.J.Super. at 319, 428 A.2d at 970.

### D. *Negligent Infliction of Emotional Distress*

■ In order for plaintiffs to recover for negligent infliction of emotional distress, plaintiffs must show that defendant had a duty, that the duty was owed toward plaintiffs, that defendant breached that duty, that plaintiffs were injured, and that the breach caused the injury.

Defendant has a duty to meet "the standard of care reasonably to be expected of [someone] in dealing with corpses." *Muniz v. United Hosps. Medical Center Presbyterian Hosp.*, 153 N.J.Super. 79, 82, 379 A.2d 57, 58 (App.Div.1977). *See also Strachan*, 109 N.J. at 529, 538 A.2d at 349 (duty on part of hospital to act reasonably in honoring family's request to turn over body of dead son).

If defendant breached any duty, the duty is one owed to plaintiffs and not to plaintiffs' decedent, Todd. In *Strachan*, the court noted that the defendants, in failing to turn off plaintiffs' decedent's respirator, did not breach any duty owed to plaintiffs'

decedent because he was no longer alive, and stated that "[p]laintiffs' distress, therefore, was not the result of witnessing another's injury, but rather the result of a breach of duty owed directly to plaintiffs." *Id.* at 535, 538 A.2d at 352. Gene Lacy, as *Administrator Ad Prosequendum* of the Estate of Todd Lacy, cannot maintain an action against defendant Dr. Dunst. He can only do so in his capacity as a parent of Todd Lacy since any breach would be a breach of a duty owed to Todd's parents and not to Todd.

The injury which may result from a breach of that duty is the emotional distress of the parents. Plaintiff does not need to prove bodily harm in order to recover.[9] *Id.* In *Strachan*, the New Jersey Supreme Court specifically noted that negligent mishandling of a corpse is an exception to the rule requiring that the plaintiff be injured physically. The rationale is that the mishandling of a corpse creates "an especial likelihood of genuine and serious mental distress ... which serves as a guarantee that the claim is not spurious." *Strachan*, 109 N.J. at 537, 538 A.2d at 353 (quoting Keeton, § 54, at 362). A claim for emotional distress involving mishandling of a corpse is not *per se* genuine, but a plaintiff may recover for negligent infliction of emotional distress when plaintiff suffers only emotional distress.

### E. *Elements to Recover for Emotional Distress Not Satisfied*

■ This court finds that as a matter of law plaintiffs do not suffer emotional distress so severe that no reasonable person could be expected to endure it. Courts have often denied recovery for intentional infliction of emotional distress because the distress was not severe. *See Buckley*, 111 N.J. at 367–368, 544 A.2d at 864 (listing

---

9. It should also be noted that *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521 (1980) does not apply. In *Portee*, the Supreme Court of New Jersey held that a defendant is liable where plaintiff's distress resulted from perceiving the negligently inflicted injuries of another, even if plaintiff is in no danger. *Id.* at 99–100, 417 A.2d at 527. Here, plaintiffs are not third parties witnessing the death or serious physical injury of another

due to defendant's negligence. This case involves the alleged breach of a duty to the plaintiffs and their alleged resulting injury, here emotional distress. *See Strachan*, 109 N.J. at 534–35, 538 A.2d at 352 (*Portee* not intended to cover all emotional distress actions but rather only "where the plaintiff suffers distress from witnessing an accident resulting from the breach of a duty owed another").

cases from other states where court has rejected claims for intentional infliction of emotional distress because emotional distress not sufficiently severe). In *Buckley*, the plaintiff lost sleep, was aggravated and embarrassed, had headaches, and suffered nervous tension. *Id.* The court found "this evidence is insufficient as a matter of law to support a finding that the mental distress was so severe that no reasonable [person] could be expected to endure it." *Id.*

The Appellate Division in *Burbridge v. Paschal*, 239 N.J.Super. 139, 570 A.2d 1250 (App.Div.1990), applied the *Buckley* standard and approved the lower court's conclusion that the issue of severity should not go to the jury. *Id.* at 157–58, 570 A.2d at 1260. The lower court judge had found no intentional infliction of emotional distress because the distress was not severe and had stated

> We have certainly some emotional distress. I don't doubt that ... We do have a situation where it seemed that the Plaintiffs were able to live with the problem fairly well. Although there's no question that it was an annoyance and bothersome and caused them upset, that type of thing. I think the evidence is not sufficient on the severe emotional aspect to send this cause of action to the Jury. *Id.*

In *Acevedo v. County of Essex*, 207 N.J. Super. 579, 504 A.2d 813 (Law Div.1985), the Law Division of the Superior Court of New Jersey held that plaintiff failed to establish the elements for negligent infliction of emotional distress. *Id.* at 584, 504 A.2d at 816. Plaintiff's son's dead body had been exhumed and reexamined four months after the burial. *Id.* at 583, 504 A.2d at 815. The court noted that plaintiff's answers to interrogatories did not refer to medical bills, permanency, or damage and, thus, it concluded that plaintiff had not suffered severe emotional distress. *Id.* at 586, 504 A.2d at 817.

In *Decker*, the Supreme Court of New Jersey rejected plaintiff's claim of negligent infliction of emotional distress based on publication of a false obituary. 116 N.J.

at 431, 561 A.2d at 1129. The court noted that "the alleged emotional distress approximates the subjective reactions of ordinary persons". *Id.*

Here plaintiffs' answers to interrogatories refer only to "emotional distress." During her deposition, Jane Lacy reported that she was angry, she grieved, she had stress, and she did not sleep at night. Deposition of Jane Lacy at 29–32, 52–55. She has not had any psychiatric treatment since Todd's death nor does she think such treatment would be beneficial to her. *Id.* at 55. As for Gene Lacy, he stated that he was upset and that he and his wife "are working toward emotional stability concerning my son's death and the events that led up to it and that have followed it, that we're still working that through but we are working it through." Deposition of Gene Lacy at 76, 82. Plaintiffs' distress is not sufficiently severe to allow for recovery.

This court expresses no opinion concerning defendant Dunst's conduct nor does it make any judgment regarding whether or not Todd was dead at the time of the third pericardiocentesis. The court concludes, however, that the mental distress suffered by the Lacys, as a matter of law, cannot support a finding that it was so severe that no reasonable person could be expected to endure it.

## CONCLUSION

For the foregoing reasons, this court will grant defendant Dr. Dunst's motion for summary judgment as to this defendant and dismiss with prejudice the complaint against him. An appropriate order will be entered.