FRANCES KELLY *vs.* BRIGHAM & WOMEN'S HOSPITAL &
others.[1]

No. 98-P-1904.

Suffolk. October 12, 2000. - April 11, 2001.

Present: GREENBERG, KAPLAN, & DUFFLY, JJ.

*Practice, Civil,* Summary judgment. *Negligence,* Emotional distress. *Wrongful Autopsy. Dead Body. Evidence,* Expert opinion, Emotional state. *Emotional Distress. Intentional Conduct.*

Discussion of the cause of action of tortious interference with a dead body, also characterized as a claim for wrongful autopsy. [301-302]

Expert testimony was not required to establish negligence in a wrongful autopsy claim. [303-305]

This court concluded that proof of a wrongful autopsy claim does not require evidence that the plaintiff have actually witnessed the autopsy or viewed the body postautopsy, where the basis of such a claim is the representation made to a plaintiff as to the scope of an autopsy or the defendants' failure to secure appropriate authorizations. [305-308]

In an action alleging unauthorized autopsy on the plaintiff's deceased spouse and negligent infliction of emotional distress, the plaintiff submitted, on the defendants' motion for summary judgment, sufficient evidence of her emotional distress to warrant denial of the motion with respect to both claims. [308-310]

In a claim for wrongful autopsy, summary judgment was properly entered in favor of a resident-in-training who was part of the autopsy team and who had acted pursuant to the terms of a written permission form without knowledge of any representations made to the plaintiff limiting the scope of the examination; further, the judge properly denied the plaintiff's motion to amend the complaint to add two other members of the autopsy team who had similarly acted pursuant to the consent form without knowledge of the plaintiff's circumstances. [310]

In an action for wrongful autopsy, evidence submitted on the defendant's motion for summary judgment did not support the plaintiff's claim of intentional infliction of emotional distress [310-311]; however, the plaintiff's evidence on her claim for negligent misrepresentation was sufficient to withstand the defendants' motion [311-312].

CIVIL ACTION commenced in the Superior Court Department on January 29, 1997.

[1]Michael Vasconcelles and Sara Vargas.

The case was heard by *Vieri Volterra, J.,* on a motion for summary judgment.

*Anne F. McDonough* for the plaintiff.

*M. Catherine Huddleson* for the defendants.

GREENBERG, J. Frances Kelly, whose husband Michael died of complications from non-Hodgkins lymphoma, sued the Brigham & Women's Hospital (hospital) and two physicians, Michael Vasconcelles, an oncologist, and Sara Vargas, a resident working in the hospital's pathology department. The plaintiff seeks to recover on four discrete theories for depression and emotional distress caused by an autopsy performed on her husband, the scope of which exceeded what she had authorized.[2] Upon the defendants' motion for summary judgment, a judge of the Superior Court concluded that the plaintiff had failed to make out a prima facie case on all claims, and she appeals. The plaintiff also complains of the Superior Court judge's denial of her motion to amend her original complaint to add two other physicians, Madeleine Kraus and Craig Lilly.[3]

These are the material facts presented, where disputed, in the light most favorable to the nonmoving party. See, e.g., *Gray* v. *Giroux,* 49 Mass. App. Ct. 436, 438 (2000). The plaintiff's husband, a forty-two year old man with a history of cancer, relapsed in the summer of 1994. He was admitted to the hospital on August 3, 1994, by Vasconcelles, who had managed his care since 1992. On his fifth day at the hospital, the plaintiff's husband was transferred to the intensive care unit because of his worsening condition. While alone with the plaintiff at the hospital, Vasconcelles brought up the subject of an autopsy. He sought permission from her because, at that point, her husband was intubated, sedated, and unable to communicate, and the plaintiff was his health care proxy. She initially refused, saying, "You know Michael's just been through so much. I really don't want to put him through anymore." Pressed by Vasconcelles to

---

[2]The plaintiff's eleven-count complaint alleged causes of action against the hospital, Vasconcelles, and Vargas for (1) tortious interference with a dead body; (2) negligent infliction of emotional distress; and (3) intentional infliction of emotional distress. The complaint also sets forth counts for misrepresentation against the hospital and Vasconcelles.

[3]The motion judge denied the motion to amend as futile.

reconsider, the plaintiff asked whether the specimens could be obtained by an aspiration needle rather than by cutting his body. Although Vasconcelles was not a trained pathologist, he assured her that the incision, if one were required, would not be more than two to three inches in length.[4] At that time, she gave her written consent for a limited autopsy by signing a form that Vasconcelles provided. The consent form restricted the procedure to a "biopsy of the liver and right lung ONLY," (emphasis in original) and stated in writing that the pathologists "[m]ay make [an] incision to obtain autopsy specimens, if necessary." No limitations on the size of the incision, upon which the plaintiff alleges she relied in giving consent, were specified on the form.

Michael Kelly died on August 11, 1994. On the morning of August 12, Dr. Madeleine Kraus, the chief resident of the hospital's pathology department, performed the autopsy, with verbal approval from Dr. Craig Lilly, who headed the clinical team that cared for Kelly during his stay in the hospital's intensive care unit. Vargas, a resident-in-training, observed, prepared tissue samples, and reported the autopsy results as a "prosector." We may infer from the materials that appear in the hospital record that neither Kraus nor Vargas had any knowledge of the conversation between the plaintiff and Vasconcelles concerning the limits agreed upon before she signed the consent form. Vasconcelles and Lilly were not present at the autopsy.

In response to a question put by the plaintiff's lawyer, Vargas stated that she believed "it was necessary to cut to do a thorough and complete autopsy." Because the permission form limited the autopsy team to a single incision, the team was required to make a cut large enough to sample both the lung and the liver, rather than two smaller cuts. Vargas stated that a needle biopsy is "not in accordance with [the] practice I've seen so far in my training where we're taught to try to maximize the chance of diagnosis while maximizing the body's appearance for [a] potential funeral."

---

[4]Vasconcelles disputes making this representation. We do not resolve issues of material fact, assess credibility, or weigh evidence in reviewing a summary judgment motion. See *Kelley* v. *Rossi*, 395 Mass. 659, 663 (1985); *Zhang* v. *Massachusetts Inst. of Tech.*, 46 Mass. App. Ct. 597, 604 (1999). See also *Gray* v. *Giroux, supra.*

Kraus made an incision that extended from the middle of the decedent's chest down to his waist around to the lower back. According to Kraus, whose memorandum is part of the record but who was not deposed, its length was approximately twenty to twenty-five centimeters, or eight to ten inches. As a result, the sutured incision was plainly visible to the funeral home director, Lawrence Keaney, who viewed the body after it arrived at his funeral home. He called the plaintiff and told her what he had found. She became upset and agitated. When the plaintiff subsequently arrived at the funeral home, Keaney showed the plaintiff the pictures he had taken of the body to spare her the ordeal of viewing it. The plaintiff again became upset and had a panic attack. At the wake, she confronted Vasconcelles and told him that he had "broken [her] trust." Vasconcelles noted that she was visibly upset and angry. She continued for some time after the events to have panic attacks and depression that were ameliorated, to some extent, by tranquilizers and antidepressant medications.

Two weeks after her husband's death, the plaintiff broke down while teaching preschool at the Alice Burke School and decided it was necessary to leave this position. She claims that a preexistent panic disorder was aggravated by thoughts of her husband's scarred body. Her complaints continued for the year she remained in the United States before her return to England where other family members reside. She also indicated that she experienced nightmares (when later her father had heart surgery), and that she used klonapan and diazapam, medications prescribed for anxiety disorders.

1. *Disposition on summary judgment.* We note at the outset our reluctance to grant summary judgment in negligence actions, based on our traditional deference to a jury's "unique competence in applying the reasonable man standard to a given fact situation." *Foley* v. *Matulewicz,* 17 Mass. App. Ct. 1004, 1005 (1984), quoting from 10A Wright & Miller, Federal Practice and Procedure § 2729, at 194 (2d ed. 1983). See *Roderick* v. *Brandy Hill Co.,* 36 Mass. App. Ct. 948, 949 (1994), citing *Mullins* v. *Pine Manor College,* 389 Mass. 47, 56 (1983) (holding that, because negligence typically involves questions of fact, negligence actions are usually inappropriate for sum-

mary judgment). Here the motion judge, on the basis of the facts we have recited, decided that, without the aid of expert testimony, no reasonable fact finder could conclude that the defendants' conduct was either negligent (i.e., fell below the acceptable standard of care), reckless, or intentional. It was on this basis that he ruled in favor of the defendants. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991) ("a party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass.R.Civ.P. 56[c], unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case"). In this case, however, the materials submitted by the plaintiff were sufficient to withstand summary judgment on three of the four claims against Vasconcelles.

2. *Wrongful Autopsy—Negligent Infliction of Emotional Distress Against Vasconcelles.* We begin with a brief history of the plaintiff's primary claim, tortious interference with a dead body, better characterized as a claim of wrongful autopsy. Massachusetts has long recognized that survivors may experience compensable mental distress when the corpse of a loved one is subjected to an unwanted autopsy. See *Burney* v. *Children's Hosp.*, 169 Mass. 57, 59-60 (1897). The Supreme Judicial Court ruled that the natural guardian of a child has a possessory right to the body for burial and may maintain an action for an unauthorized autopsy. See *ibid.*, quoting from *Pierce* v. *Swan Point Cemetery*, 10 R.I. 227, 237 (1872) (concluding that "it would be discreditable to any system of law not to provide a remedy" where the corpse was violated). A surviving spouse has no less of a right, assuming the decedent or a statute has not otherwise assigned such authority. Cf. *Stackhouse* v. *Todisco*, 370 Mass. 860, 860 (1976) (holding that a surviving spouse generally has the right to the decedent's body for the purposes of burial and other disposition).

There is no question that a hospital or its medical personnel, absent statutory authority, may not order the removal of tissue or other body parts of a deceased person for forensic or scientific study without consent from the spouse or next of kin. See G. L.

c. 38, § 4, concerning jurisdiction of medical examiner. Because many persons regard an autopsy with aversion, it may not legally be performed without consent of the person having the duty to bury the body unless authorized by statute. See, e.g., *Parker* v. *Quinn-McGowen Co.*, 262 N.C. 560, 562 (1964). The need for a remedy for injuries caused by unauthorized autopsies sets such a claim apart from other negligent, intentional, or reckless injuries to dead bodies. See *ibid.* (noting the difference between "mutilation" occurring while preparing a body for burial and "mutilation" occurring to advance medical science). See also Annot., Liability for Wrongful Autopsy, 18 A.L.R.4th 858 (1982 & Supp. 2000). Cf. *Green* v. *Southern Transplant Serv., Inc.*, 698 So. 2d 699, 701 (La. Ct. App. 1997) (noting contemporary society's respect for remains of the dead as attested to by the "tremendous impact the demand for the return of the remains of our Vietnam War dead has had on foreign policy"). As the Supreme Judicial Court remarked in *Burney*, the right asserted against those who perform a wrongful autopsy "is the right to what remains when the breath leaves the body, and not merely to such a hacked, hewed, and mutilated corpse as some stranger, an offender against the criminal law, may choose to turn over to an afflicted relative." *Burney*, 169 Mass. at 60, quoting from *Foley* v. *Phelps*, 1 A.D. 551, 555 (N.Y. 1896). This is even more true today, when advances in postmortem medical research and the expanding uses of biological materials harvested from cadavers intensify questions of survivors' rights.

We now turn to the parties' arguments. The plaintiff claims that Vasconcelles was negligent in failing to communicate the scope of authorization to perform an autopsy on her husband's body. She argues that, by allowing surgical removal of liver and lung specimens without conforming to the limits of her permission, Vasconcelles directly violated her right to determine the disposition of her husband's remains. Because a claim for wrongful autopsy is in effect a claim for emotional distress, we incorporate our analysis of the plaintiff's negligent infliction of emotional distress claim into that of her wrongful autopsy claim. See Prosser & Keeton, Torts § 54, at 362 (5th ed. 1984) (defining a special case for the negligent mishandling of a corpse).

A. *Evidence of Negligence in a Wrongful Autopsy Claim.* As a threshold matter, we reject the defendants' argument that the plaintiff's failure to produce expert testimony that Vasconcelles's conduct fell below an acceptable standard of care was fatal to her claim. Because a wrongful autopsy claim is based on the general principles governing the tort of negligence, the plaintiff must show that Vasconcelles owed her a duty, that his act or failure to act was negligent, and that the negligence caused her harm. While the *Burney* court did not state whether such a claim contemplated intentional or merely negligent conduct, see *Burney,* 169 Mass. at 59-60, we conclude that the wrongs which the cause of action seeks to remedy are identical to those caused by negligent infliction of emotional harm.

The judge in this case reasoned that the plaintiff failed to meet her *Kourouvacilis* burden when her opposition to the defendants' summary judgment motion failed to include proof from a qualified expert that Vasconcelles's handling of the procurement of the consent to perform the autopsy was unacceptable. The judge's approach was erroneous. Prior to filing the rule 56 motion, the defendant's request for a medical tribunal under G. L. c. 231, § 60B, had been denied. Cf. *Little* v. *Rosenthal,* 376 Mass. 573, 576-577 (1978) (noting that "all treatment-related claims," but not necessarily all health care practices, fall within malpractice tribunal jurisdiction). Still, the defendants argue that given the "abstruse" nature of the issues involved, a fact finder, unaided by expert testimony, "would not be sufficiently instructed by common knowledge or experience but would be left to conjecture." *Ward* v. *Levy,* 27 Mass. App. Ct. 1101, 1102 (1989).

Unlike informed consent issues between doctor and patient necessitating expertise that laypersons usually lack, the factual question here does not require any more expertise than that supplied by everyday experience. See, e.g., *Gabrunas* v. *Miniter,* 289 Mass. 20, 22-23 (1935) (jury competent without expert testimony to assess whether doctor was negligent in failing to remove bean from plaintiff's ear); *Malone* v. *Bianchi,* 318 Mass. 179, 182 (1945) (jury competent without expert testimony to consider whether dentist was negligent for permitting a tooth to drop down plaintiff's mouth); *Lipman* v. *Lustig,* 346 Mass. 182,

184 (1963) (jury competent without expert testimony to assess whether dentist was negligent for dropping a dental instrument into the plaintiff's mouth). See also *Polonsky* v. *Union Hosp.*, 11 Mass. App. Ct. 622, 624 (1981) (declining to rule that expert testimony was required to prove hospital's negligence in failing to lower plaintiff's bed rails).

Even if this were a medical malpractice case, it would be, as to Vasconcelles, an "exceptional" one in which "the negligence and harmful results are sufficiently obvious as to lie within common knowledge." *Collins* v. *Baron*, 392 Mass. 565, 568 (1984), quoting from *Haggerty* v. *McCarthy*, 344 Mass. 136, 139-140 (1962).

*Martin* v. *Lowney*, 401 Mass. 1006 (1988), and *Benson* v. *Massachusetts Gen. Hosp.*, 49 Mass. App. Ct. 530 (2000), the informed consent cases cited by the defendants for the proposition that evidence from an expert witness was necessary for the plaintiff's cause of action to survive the motion for summary judgment against Vasconcelles are distinguishable. In these cases, the issue before the fact finder would have been the sufficiency of the information given to the patient concerning "the nature of the risks and benefits that a health care institution would have been expected to provide in the circumstances." *Id.* at 531. No such analysis of risks and benefits or the necessity of conveying them is pertinent here. Instead, the factual issue is a much more straight-forward one: whether Vasconcelles assured the plaintiff that the incision would only be two to three inches, a representation that he denies. A physician's duty to convey a plaintiff's clearly expressed limitation on the scope of an autopsy, rather than any questions about the methodology used, does not rise to a level of complexity beyond a jury's comprehension without the benefit of expert testimony.

The burden is on the defendants, as the moving parties, to demonstrate affirmatively the absence of a triable issue and further that the moving party is entitled to judgment as a matter of law. *Pederson* v. *Time, Inc.*, 404 Mass. 14, 16-17 (1989). The defendants failed to satisfy their burden as to Vasconcelles under this standard. It appears from the complaint, and other materials contained in the opposition, that Vasconcelles knew from the start that the plaintiff was reluctant to give unrestricted

permission. The idea of an intrusive procedure scarring her husband's body made the plaintiff uneasy, yet Vasconcelles prevailed by assurances that were arguably made without proper consultation. Because expert testimony in this regard is not an essential element of the plaintiff's case, countervailing materials on this point were unnecessary.

Having explained why a lack of expert testimony did not vitiate the plaintiff's wrongful autopsy claim against Vasconcelles, we turn to the defendants' argument that she failed to present adequate evidence of her emotional distress. The defendants make a two-pronged argument: first, that the plaintiff failed to provide sufficient corroborative evidence of physical harm, and second, that the plaintiff failed to show that her distress claim satisfied the temporal, spatial, and perceptual conditions of the so-called "bystander" cases. We deal with each of these arguments in turn.

B. *Evidence of Emotional Distress.* A review of the Massachusetts cases dealing with the proof required to establish such claims, cited in the margin, reveals the recurring concern with "the difficulty of discriminating between real and fraudulent or imagined emotional injuries." *Migliori* v. *Airborne Freight Corp.*, 426 Mass. 629, 631 (1998). The general rule for such claims is that the plaintiff "must do more than allege 'mere upset, dismay, humiliation, grief, and anger' . . . . Rather, plaintiffs must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial." *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129, 137-138 (1993).[5]

At her deposition, the plaintiff testified that she had

---

[5]Prior to *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129, 134 (1993), a plaintiff seeking to recover for negligent infliction of emotional distress had to allege and prove physical harm resulting from the conduct that caused the distress and the physical harm had to be "manifested by objective symptomatology and substantiated by expert medical testimony." *Payton* v. *Abbott Labs*, 386 Mass. 540, 556 (1982). This physical harm requirement was refined in *Sullivan*, 414 Mass. at 134, "so as to achieve a just result in this case and to strike a proper balance between the fear of fraudulent claims and the danger of shutting the doors of the courthouse to worthy plaintiffs." *Ibid. Migliori* v. *Airborne Freight Corp.*, 426 Mass. at 631-632, shifted the emphasis by requiring "some" objective corroboration as an alternative to physical harm. Our recent

experienced various psychosomatic ailments and had taken antidepressant medications prescribed by a physician after observing postautopsy photographs of her husband's corpse. The only materials offered by the defendants are the plaintiff's answers to cross-examination at her deposition. Although less informative than one might wish, the plaintiff's responses establish an acceptable basis for a trier of fact to conclude that some of her emotional distress legitimately arose from Vasconcelles's conduct.

While there is no mention of medical treatment after her husband's demise, the plaintiff had cramps, shortness of breath, and nightmares. While it is true that these complaints could be self-serving, the defendants filed nothing — and the record contains nothing — setting forth facts that differentiate the plaintiff's symptoms from those described in the cases of *Sullivan* v. *Boston Gas, supra,* and *Bresnahan* v. *McAuliffe,* 47 Mass. App. Ct. 278 (1999). See note 5, *supra.* Thus, while it is a close question, the plaintiff testified to sufficient emotional distress to survive the defendants' motion for summary judgment.

As we have explained, a claim of emotional distress requires "enough" objective evidence of emotional distress caused by the defendant's negligence. See *Sullivan* v. *Boston Gas,* 414 Mass. at 137-138. Decisions from other States have held that a plaintiff need not allege elements of damage in addition to emotional distress in order to recover for a negligent autopsy. See, e.g., *Liberty Mut. Ins. Co.* v. *Lipscomb,* 56 Ga. App. 15, 18 (1937) (permitting cause of action to stand without allegations of physical harm where a wrongful autopsy "was in reckless disregard of plaintiff's rights, and embarrassing and humiliating to her"); *Green* v. *Southern Transplant Serv., Inc.,* 698 So. 2d at 701 (permitting recovery for "whatever emotional distress

decision in *Bresnahan* v. *McAuliffe,* 47 Mass. App. Ct. 278 (1999), followed. The motion judge did not have the benefit of *Bresnahan's* teachings at the time he allowed the defendants' summary judgment motion. In that case we reversed the allowance of summary judgment against parents who sought compensation for emotional distress suffered as a result of improper funeral and burial services for their stillborn son. The opposition materials submitted by the Bresnahans showed that they suffered stomach pain, nausea, body shakes, and reduced libido. *Id.* at 285. We concluded that the lack of medical evidence made it more difficult, but not impossible, for the plaintiffs' case to survive a summary judgment motion. *Ibid.*

they could prove at a trial on the merits for the desecration of the body of the decedent"). See also Restatement (Second) of Torts § 868 (1977) (finding "no need to show physical consequences of the mental distress" in claims based on negligent mistreatment or interference with a dead body). Contrast *Burgess* v. *Perdue*, 239 Kan. 473, 480-481 (1986) (requiring proof of intentional or malicious conduct in a wrongful autopsy claim where plaintiff seeks to recover for emotional distress). Contrast *Sackett* v. *St. Mary's Church Soc.*, 18 Mass. App. Ct. 186 (1984) (declining to adopt Restatement [Second] of Torts § 868 in a negligent infliction of emotional distress claim arising from the mismanagement of a decedent's burial); *Ramirez* v. *Health Partners*, 193 Ariz. 325, 333 (Ct. App. 1998) (discussing policy reasons to require "more than negligence" in claims involving the Uniform Anatomical Gift Act).

Courts that recognize wrongful autopsy claims are concerned with the effect the mutilation has on the psychological, rather the physical, well-being of the surviving relatives. See, e.g., *Eastin* v. *Ochsner Clinic*, 200 So. 2d 371, 373 (La. App. Ct. 1967); *Jackson* v. *Rupp*, 228 So. 2d 916, 918 (Fla. Dist. Ct. App. 1969). When a close family member, traumatized by the death of a loved one, experiences serious mental anguish caused by damage to the deceased's remains, "the special circumstances serve as a guarantee that the claim is not spurious." Prosser & Keeton, Torts § 54, at 362 (5th ed. 1984). Emotional distress is the natural and proximate result of knowing that the remains of a deceased family member have not been preserved as the family desired. See *Larson* v. *Chase*, 47 Minn. 307, 310-311 (1891) (once the invasion of a legal right to custodianship of a corpse is established, "the law infers some damage, and, if no evidence is given of any particular amount of loss, it declares the right by awarding nominal damages"). Accord *Rollins* v. *Phillips*, 554 So. 2d 1006, 1008 (Ala. 1989) ("It is a matter of common knowledge in civilized society that close relatives and friends possess deep-seated feelings and emotions regarding the remains of their dead. The person or persons with the duty of burying a loved one have the right to see that the body is preserved and their feelings in relation thereto protected"); *Parker* v. *Quinn-*

*McGowen Co.*, 262 N.C. at 562 ("For any mutilation of a dead body the one entitled to its custody may recover compensatory damages for his mental suffering caused thereby if the mutilation was either intentionally or negligently committed, or was done by an unlawful autopsy" [citation omitted]); *Jobin* v. *McQuillen*, 158 Vt. 322, 328 (1992) (acknowledging "the special sensitivity that accompanies the handling of corpses" that justifies claims for negligent infliction of emotional distress without accompanying physical harm). Thus, the plaintiff's allegation of emotional distress was sufficient to withstand the motion for summary judgment, notwithstanding her limited evidence of accompanying physical harm and the absence of corroborative evidence.

C. *Evidence of Proximity.* The defendants advance an additional contention on appeal not made to the court below that the wrongful autopsy and emotional distress claims must fail because the plaintiff did not witness the autopsy or view the postautopsy body directly, and, therefore, that she was outside the "scope of liability for emotional harm" discussed recently in *Migliori* v. *Airborne Freight Corp.*, 426 Mass. at 631-633. The defendants cite no Massachusetts case, and we are aware of none, that precludes a wrongful autopsy claim because the family member did not witness the autopsy. By this rationale, virtually all claims arising from unauthorized autopsies would be precluded because the damages claims are based on the knowledge, and not the sensory impact, of the damage to a loved one's remains.

Cases for unauthorized autopsy rest on the breach of a duty to the claimant, unlike the bystander cases that are predicated on the witnessing of a breach of duty to a loved one. See, e.g., *Lacy v. Cooper Hosp./Univ. Med. Ctr.*, 745 F. Supp. 1029, 1035 (D. N.J. 1990) (bystander cases do not apply where a negligent infliction of emotional distress claim arises from an unauthorized postmortem procedure, because such a claim is based on a defendant's breach of a duty to the plaintiffs, and not to the decedent); *Green* v. *Southern Transport Serv., Inc.*, 698 So. 2d at 701 (such claims are for damages sustained *directly* by the claimants and not to be considered in the category of derivative claims for emotional distress resulting from physical harm to a

third party). See also *Alderman* v. *Ford*, 146 Kan. 698, 702 (1937), quoting from *Larson* v. *Chase*, 47 Minn. 307, 312 (1891) (emotional distress "would be ordinarily the natural and proximate result of *knowledge* that the remains of a deceased husband had been mutilated" [emphasis added]); *Everett* v. *Southern Transplant Serv., Inc.*, 700 So. 2d 909, 912 (La. Ct. App. 1997) (Byrnes, J., concurring) (injury in a wrongful autopsy case is not physical damage to the body of the decedent but "to the survivors in the form of emotional distress arising out of the *knowledge* that the desecration has occurred" [emphasis in original]). Cf. *Christensen* v. *Superior Court*, 54 Cal. 3d 868, 894 (1991) (mishandling of a corpse is "likely to cause serious emotional distress to members of the decedent's immediate family regardless of whether they observe the actual negligent conduct or injury to the remains of their decedent").

In *Migliori* v. *Airborne Freight Corp.*, *supra*, the Supreme Judicial Court observed that proximity requirements are "grounded in practical need to draw a determinate line against excessive liability . . . [rather] than on grounds of fairness or other imperatives of corrective justice." *Id.* at 633. Such policy-based limits on potential claimants are not applicable in a wrongful autopsy case where the plaintiff is the primary victim of negligence.[6] To hold otherwise would not merely reduce the class of potential plaintiffs in a wrongful autopsy claim to a

---

[6]A recent English decision, *Page* v. *Smith*, 1 App. Cas. 155, 184 (H.L. 1996), stated that "in cases involving nervous shock, it is essential to distinguish between the primary victim and secondary victims." *Id.* at 197. The Law Lords rejected application of proximity-based "control mechanisms" to limit negligently inflicted emotional distress claims where the plaintiff is the direct or "primary" victim of the defendant's breach. See *id.* at 197. A traditional bystander-plaintiff is a passive and unwilling witness to injury to others. See *ibid.* Where, however, the plaintiff is directly harmed by a defendant's alleged negligence, "[p]roximity of relationship cannot arise, and proximity in time and space goes without saying." *Ibid.* While proximity requirements are necessary in the bystander cases to avoid unchecked liability, "[n]one of these mechanisms are required in the case of a primary victim. Since liability depends on foreseeability of physical injury, there could be no question of the defendant finding himself liable to all the world." *Ibid.*

Accordingly, where the plaintiff holds the right to authorize an autopsy, questions of the plaintiff's proximity of relationship to the deceased are irrelevant. The only relevant qualifier is whether the plaintiff is the lawful holder of the right. Further, questions of temporal and spatial proximity go

manageable number, but would virtually eliminate the cause of action. It would be most unlikely that family members would be present during an autopsy, because many "regard an autopsy with extreme aversion." *Parker* v. *Quinn-McGowen Co.*, 262 N.C. at 562. In wrongful autopsy cases, the plaintiffs' claims are based on representations made directly to them concerning the scope of the autopsy procedures, or in the failure to secure appropriate authorizations. Because the plaintiff in this case is the primary victim of the alleged negligence, and not one who merely experiences "distress at witnessing some peril or harm to another person," Prosser & Keeton, Torts § 54, at 365 (5th ed. 1984), we reject application of a zone of danger analysis. Thus, with respect to the wrongful autopsy-negligent infliction of emotional distress claims against Vasconcelles, a triable issue remains.

A different result pertains with respect to the same claim against Vargas, as well as to the intended claims against Lilly and Kraus.[7] In observing, performing, and reporting on the autopsy, these individuals acted pursuant to the terms of the written permission form. Any agreement Vasconcelles had made with the plaintiff to limit the length of the incision, unless "necessary" to extract specimens from her husband's body, was not made known to Vargas, Lilly, or Kraus. Further, assuming that it would be material, there is nothing to show that these parties had any knowledge of the plaintiff's reluctance and sensitivity to the autopsy procedure itself. In the circumstances, Vargas was entitled to the summary judgment she sought because nothing in the record suggests that she breached any duty to the plaintiff. Because any action against Lilly and Kraus would be framed similarly to that against Vargas, we do not disturb the motion judge's denial of the motion to amend.

3. *Intentional Infliction of Emotional Distress.* Liability for intentional infliction of emotional distress can arise only from conduct so outrageous and extreme as to go " 'beyond all pos-

---

without saying where the alleged wrong occurs as a breach of a duty owed directly to the plaintiff.

[7]There was no argument presented as to the hospital, and we therefore deem any argument pertaining to the impropriety of granting summary judgment in favor of the hospital to have been waived. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

sible bounds of decency' and 'utterly intolerable in a civilized community.' " *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145 (1976), quoting from Restatement (Second) of Torts § 46 comment d (1965). There is nothing in the plaintiff's deposition testimony or Vasconcelles's statements to the autopsy team that support a theory that Vasconcelles recklessly misled the plaintiff or that he had actual knowledge that the procedure would be so intrusive. It appears from his deposition testimony that Vasconcelles believed Michael Kelly would have wanted an autopsy performed so that the precise nature of his disease would be known. Vasconcelles's intellectual curiosity may have been his real motive. Even so, the motion judge was warranted in concluding that Vasconcelles had not purposefully distorted his patient's perceived wishes. Thus, Vasconcelles's conduct falls within the boundaries of the conduct found not to constitute outrageous acts by decisions prior to the dates of the incidents in this case.[8] Contrast *Bresnahan* v. *McAuliffe*, 47 Mass. App. Ct. at 282-283 (finding sufficient evidence of outrageousness where defendant funeral home was either "intentionally callous or incredibly insensitive"). Vasconcelles's long and caring relationship with the plaintiff and the decedent, the time spent consulting with the plaintiff prior to the autopsy, and his attendance at the wake all comport with or exceed normative conduct.

4. *The misrepresentation claim.* We have outlined the elements of proof for misrepresentation in *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 77-79 (1991), and there is no need for us to repeat them. Here, at the very least, Vasconcelles arguably misrepresented the length of the incision because he could easily have ascertained whether the pathologist needed to make a

---

[8] Cf. *Richey* v. *American Automobile Assn., Inc.*, 380 Mass. 835, 839 (1980) (no finding of outrageousness warranted even if defendant employer's decision to terminate hypersensitive employee might legitimately be characterized as bad, unjust, and unkind); *Beecy* v. *Puccirelli*, 387 Mass. 589, 596 (1982) (conduct in question might be reprehensible, but could not be characterized as extreme and outrageous); *Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466-467 (1997) (even if law firm's drafting of will was negligent, it did not constitute extreme and outrageous conduct); *Quinn* v. *Walsh*, 49 Mass. App. Ct. 696, 707-708 (2000) (openly conducted extramarital affair did not constitute outrageous conduct to support a cause of action for intentional infliction of emotional distress).

larger cut to visualize the "entire" liver and lung. *Id.* at 77, quoting from *Acushnet & Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. 604, 605 (1988) ("The speaker need not know 'that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker'"). See *Massey* v. *Duke Univ.*, 130 N.C. App. 461, 465 (1998) (finding a triable issue whether vulnerable plaintiffs relied on defendant's alleged misrepresentation of the scope of an autopsy).

The defendants maintain that the plaintiff's submissions do not show that Vasconcelles had any actual intent to deceive and that the plaintiff's lack of expert testimony left no basis to disprove whether his estimate was false. In his deposition testimony, however, Vasconcelles expressed no uncertainty about how the biopsy would be done. Even if Vasconcelles's prognostications were made with the belief that he was correct, there is a basis to argue, as the plaintiff does, that he should have ascertained more precise information about the procedure from a pathologist. This approach is followed especially in cases where the defendant holds himself out as one qualified to offer expert opinion on matters of which the plaintiff has little or no special knowledge. Cf. *McEneaney* v. *Chestnut Hill Realty Corp.*, 38 Mass. App. Ct. 573, 575 (1995) (allowing recovery against realtor for misrepresentation); Restatement (Second) of Torts § 539 (1977). Of the two parties, only Vasconcelles could know that the scope of the biopsy would require a larger incision. The plaintiff may reasonably not have consented to the autopsy had Vasconcelles first spoken with a more knowledgeable party and conveyed more accurate information. Compare *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 730 (1974), *S.C.*, 368 Mass. 811 (1975) (allowing liability for misrepresentation where defendant's prediction concerned matter within his control). Thus, the plaintiff's misrepresentation claim against Vasconcelles may survive the motion.

We reverse so much of the judgment dismissing the claims against Vasconcelles for wrongful autopsy (count V), negligent infliction of emotional harm (count VI), and misrepresentation (count VIII). We affirm the grant of summary judgment for the

intentional infliction of emotional harm claim against Vascon-
celles, as well as the grant of summary judgment for defendants
Vargas and Brigham & Women's Hospital on all claims.

*So ordered.*