Hopkins, Merita A., J.
The plaintiffs, individually, filed a complaint against each defendant alleging Intentional Infliction of Emotional Distress (“IIED”). The claims arose out of allegations regarding the actions of the defendants in the disposition of the corpse of Harold Kasper (“Harry”), the son of plaintiff James Kasper (“Mr. Kasper”) and sister of plaintiff Jamie Kasper (“Jamie”).
On February 4, 7, and 11, 2014 a jury-waived trial was held in this matter. Both defendants, Henry Corley (“Corley”) and Richard Magnum (“Magnum”), appeared pro se.
FACTS
After review of the testimony and exhibits presented at trial, the following facts are concluded from the credible evidence and reasonable inferences drawn therefrom.
In 2011, Mr. Kasper was the father of two adult children, a 26-year-old daughter Jamie and a 24-year-old son Harry. Mr. Kasper had divorced from the mother of his children in 1995, and he was the parent who raised the children after the divorce.
Harry required extensive care and attention due to several conditions, the most prominent being Pervasive Development Disorder (“PDD”). PDD is a condition that causes developmental issues. Harry had difficulties with life skills and social issues, and suffered from panic disorder, anxiety and depression. Harry was prescribed medications for his conditions. Harry was also prone to being led, gullible, and exercised poor judgment. He had some involvement with illegal drug use. Throughout his primary and secondary education, Harry had been placed in several schools that were specially equipped to help address his unique needs. Harry had, however, excelled as an athlete.
Mr. Kasper had a particularly close relationship with Harry. Harry required much of his father’s attention throughout his life, due to his developmental needs. Mr. Kasper was very much a caregiver of Harry. He supported Harry and exercised a certain amount of decision-making for Harry, until the time of Harry’s death.
Jamie, on the other hand, had a difficult relationship with her brother Harry for several reasons. While there is no doubt that she loved her brother very much, Harry was significantly developmentally younger, which caused much frustration for Jamie as they grew up together. Jamie acknowledged that much of Mr. Kasper’s attention revolved around Harry because of his needs. At the time of Harry’s death, Jamie was married and lived in New Jersey.
As of 2010, Harry was in therapeutic care for life skill issues at EIKOS. EIKOS is a community residence program located at 1867 Commonwealth Avenue in Brighton, MA. For a period of time, Corley lived across the street from EIKOS. During April or May 2010, Corley befriended Harry. Corley also befriended Shauwn Daniel (“Shauwn”), another resident of EIKOS and friend of Harry.
Mr. Kasper regularly visited Harry throughout the week at EIKOS. Sometimes Mr. Kasper would take Harry and his friends out to eat, or home to Newton for a visit. These ventures to Newton would often include Shauwn, but never included Corley. Over time, Mr. Kasper became acquainted with Corley dur- *623 tag his visits with Harry at EIKOS. Initially, Mr. Kasper had a favorable opinion of Corley. Mr. Kasper, Harry and Corley enjoyed playing cards together and they all enjoyed football. Throughout the good-weather months, they would sit outside, play poker, and engage in conversation approximately four times a week. Mr. Kasper thought Corley presented himself as a well-spoken individual. During this period of time, Corley became friendly with Mr. Kasper and he was well aware of Mr. Kasper’s unique relationship and involvement with Harry.
Eventually Mr. Kasper discovered that Corley was using Harry to get money, use Harry’s cell phone, and obtain rides. Corley would call Harry and tell him he needed food and money. Harry would respond by giving Corley money and buying him things. On one occasion, Corley tried to induce Harry to buy an XBOX with a credit card that was presumably stolen. Harry avoided such involvement by calling Mr. Kasper and heeding his advice not to buy it. Thereafter, Mr. Kasper told Harry not to see Corley. Mr. Kasper also blocked Harry’s cell phone from receiving any calls from Corley. The director of EIKOS (“EIKOS director”) also expressed that he did not want Corley hanging around Harry and he did not want Corley present at EIKOS. In response to Mr. Kasper and the EIKOS director’s orders, Corley would argue that Harry was an adult, implying that Harry could make his own decisions. Corley knew that Mr. Kasper did not want Harry hanging around with Corley.
Unfortunately the warnings to Harry regarding Corley, and the warnings to Corley, were disregarded. In November 2010, Corley needed a place to stay and asked Harry to let him sleep in his room at EIKOS. Harry conceded to Corley’s request and, as a consequence, Harry was expelled from EIKOS for letting Corley stay there overnight. Corley was well aware of the directions that Mr. Kasper and the EIKOS director had given regarding Corley staying away from Harry and EIKOS. Corley was aware of the consequences that Harry incurred as a result of Corley’s actions. Mr. Kasper blocked Harry’s cell phone from receiving calls from Corley. It is obvious and a reasonable inference that Corley knew he was blocked from calling Harry’s cell phone.
After his expulsion, Harry returned home to Newton to live with Mr. Kasper. Mr. Kasper supervised and participated with Harry’s activities and care on a daily basis. Harry had been a champion wrestler in high school and he obtained a position as Assistant Coach for wrestling at Newton South High School. On April 9, 2011, Mr. Kasper picked Harry up from school after wrestling practice. Harry told Mr. Kasper that he had plans to go out for Chinese food with friends. Mr. Kasper dropped Harry off at the train for his evening out with friends. Harry never returned home.
On the same evening, Corley was hanging out with Shauwn, who was still a resident of EIKOS, in the street and stores of Cleveland Circle. Sometime prior to 11 P.M., Corley decided he wanted to do heroin.[1] Corley proceeded to call Harry.[2] As a result of the call, Harry met Corley in Cleveland Circle around 11 P.M. Shauwn was also present. Harry had money and he gave $80 to Corley, who subsequently called a dealer and made arrangements to buy heroin. All three individuals — Corley, Harry, and Shauwn — waited approximately thirty minutes for a dealer to arrive. When the dealer arrived, Corley bought heroin with Harry’s money. Corley then made arrangements for them to get off the street by calling Magnum and asking if Corley could go up to his apartment.[3]
At around , midnight on April 10, 2011, Corley brought Shauwn and Harry to Magnum’s apartment, #219, at 1925 Commonwealth Avenue. Magnum was not expecting Harry and Shauwn, but he let them in. It was late and cold outside and Corley was not dressed for the weather as he lacked a hat or coat.
Magnum’s apartment consisted of a living area and kitchen with a bedroom and bathroom. Magnum is disabled and confined to a wheelchair for mobility. Magnum was watching television[4] and drinking beer in his bedroom when they arrived. Magnum stayed in his bedroom and Shauwn joined him to watch the television; Corley and Harry stayed in the living area.
Shortly after arriving, Corley and Harry went into the bathroom and injected heroin. They were in the bathroom for an extended period of time, up to one hour. Corley distributed the heroin between himself and Harry.[5] . Corley was experienced with heroin addiction from his own addiction and from former counseling and treatment, but Harry was relatively new to heroin. Corley was aware of the amount of heroin Harry was shooting up, and Corley knew Harry was overdosing. Corley knew the parameters of heroin amounts one could tolerate and he knew Harry had taken too large of a dose. Harry collapsed in the bathroom after injecting the heroin.
After spending a significant amount of time in the bathroom, Corley and Harry exited the bathroom around 1 A.M. and went to the couch in the living area. It was apparent to Corley, Magnum, and Shauwn that Harry was in discomfort and having physical difficulty. Harry had labored breathing, and moved from lying on the couch to the floor and back to the couch several times. He would fall into sleep and snore heavily, then awake and call Shauwn’s name. Harry would also groan and he could not stay awake.
From 1 A.M. to 4 A.M. Harry exhibited these difficulties. Magnum was aware of Harry’s snoring and groaning because he could hear it from the bedroom. Shauwn was aware of Harry’s problems because Harry periodically called Shauwn’s name and he could hear him from the bedroom; he also observed Harry’s distress when he checked on him about every one-half hour. Corley was aware that Harry was suffering from an overdose because he knew how much heroin Harry *624 had injected, and was present and awake, sitting on the same couch as Harry, observing Harry’s physical struggle. Corley was familiar with the signs of overdose from his own addiction and from former counseling and treatment.
Around 4 A.M., Shauwn checked on Harry. Shauwn asked him if he was okay and Harry responded “Yes.” Shauwn then left the apartment and did not return. Magnum fell asleep in his bedroom after Shauwn left. Corley also then fell asleep on the couch he shared with Harry. Harry was alive and breathing when Magnum and Corley fell asleep around 4 A.M.
Sometime in the morning of Sunday, April 10,2011, Corley and Magnum woke up. Corley realized that Harry was not breathing. Familiar with certain medical responses for drug overdose from his own experience with drug addiction and his counseling and treatment, Corley performed CPR on Harry to determine if he was heavily sedated or if he was dead from an overdose. He got no response. Corley then performed a sternum rub on Harry to see if Harry would respond. Again, he got no response. It was clear that Harry was no longer alive.
Both Corley and Magnum were now aware that Harry had died sometime after 4 A.M. when they had fallen asleep. Corley did not want to be associated with an overdose death.[6]. Magnum was immediately concerned that he would lose his housing if 911 responded to a death from overdose in his apartment. There was discussion between Corley and Magnum regarding the disposal of Harry’s body. They discussed calling 911 and declined to do so to protect their individual interests. Ultimately, Harry was put in Magnum’s manually operated wheelchair (“manual wheelchair”) that required someone to push it. Corley dressed Harry in a jacket and put a hat on his head. The clothing obscured Harry’s appearance. Corley secured Harry, whose body was in a slouched position, to the manual wheelchair by tying him into the seat with a rope.
At approximately 1:16 P.M., both Corley and Magnum exited Magnum’s apartment with Harry in the manual wheelchair. Corley entered an elevator pushing Harry’s body in the manual wheelchair and Magnum followed in his motorized wheelchair. Corley disguised his own appearance with a hat.[7]. They exited the elevator at the front door of the building on Commonwealth Avenue. Corley walked out the front door pushing Harry’s body in the manual wheelchair and walked directly across the street. Magnum left the building through a separate exit off a side corridor. Magnum was observed in an alley area outside his apartment building at 1925 Commonwealth Avenue. Between 6 to 7 minutes after exiting the elevator, Magnum reentered his apartment building through the front door on Commonwealth Avenue, and Corley followed shortly thereafter with an empiy wheelchair.[8]. They both returned to Magnum’s apartment.[9].
At approximately 2:30 P.M. on that Sunday afternoon, the Boston Police responded to a report of a person found by passerby at the back of a high rise apartment building at 1960 Commonwealth Avenue. The person was the deceased body of Harry Kasper. He was found sitting on the ground against the rear outside wall of the apartment building next to some bushes. EMS observed that the body already had rigor mortis. Syringe needles that Corley had placed around Harry’s body were also found. EMS also noticed a shoelace was wrapped tightly to Harry’s right wrist in a tourniquet fashion.[10]. Such staging reasonably suggested that Corley was trying to show that Harry had overdosed at that location in order in mask Corley’s actions of dumping the body. It also gave the appearance that Harry was by himself when he overdosed and died.-[11].
The police conducted an immediate investigation that determined Harry did not die at this location, but was placed there by another individual.[12]. After police identified the body as Harold Kasper, police visited Mr. Kasper’s home on the same afternoon, to notify him of his son’s death. Police advised Mr. Kasper of the location of Harry’s body and the fact that it appeared to have been moved to that location. Sometime thereafter, Mr. Kasper telephoned Jamie with the news of her brother’s death.
Mr. Kasper had been trying to find Harry since the previous night. No one had answered Harry’s phone. Mr. Kasper had called Harry’s friends and learned that Harry had canceled getting together with them on the prior evening for Chinese food. Mr. Kasper had not had any success in learning where Harry was located. When Mr. Kasper was advised of Harry’s death, he was distraught and despondent that Harry’s life had ended this way. Harry’s body had been dumped and staged, and Mr. Kasper did not know if Harry was deceased when he was dumped or left alone to die. Mr. Kasper did not know the circumstances of his son’s death nor the time or location (“circumstances of his son’s death”).
Mr. Kasper was later advised that the Medical Examiner determined the cause of death as Acute and Chronic Substance Abuse. There was no time of death listed.
The police continued their investigation. They obtained the video camera footage from Magnum’s apartment building and were able to view Corley and Magnum’s actions as previously described. They were also able to identify Corley at the scene of the disposal of the body. Both defendants were criminally charged regarding this incident in the BMC Brighton District Court. Ultimately, Corley pled guilty to Improper Disposition of a Human Body in violation of G.L.c. 114, §43M, and was placed on probation for three years with drug and alcohol testing and treatment. Magnum pled guilty for Failure to Report Death, in violation of G.L.c. 46, §8. He paid a fine of $5.00.[13].
Mr. Kasper remained depressed and angry about not knowing ihe circumstances of his son’s death. The *625 disposal of Hanys body had deprived him of such knowledge and the police investigation and criminal proceedings were not able to provide that information. Additionally, Mr. Kasper was angry and depressed with the knowledge that Corley had dumped Harry’s body and that he clearly knew what had happened to his son. Corley knew the close relationship between Mr. Kasper and Harry, and Corley knew how to contact Mr. Kasper. Mr. Kasper could not imagine why Corley did not call him, but rather chose to dump and stage Harry’s body. Mr. Kasper did not know if Harry had died before he was dumped or if he was left alone to die.
Mr. Kasper endeavored to learn the circumstances of his son’s death. He contacted Shauwn immediately after Harry’s death, but Shauwn did not tell him anything about the previous night.[14]. He also knew that Corley had posted the following to Facebook: “I’m so sorry. He had just learned of Harry’s passing. What good friends they were. Wish he could have done more.” This suggested to Mr. Kasper that Corley knew something about Harry’s death.
Mr. Kasper’s emotional distress caused him to conduct his own investigation regarding the circumstances of his son’s death. Mr. Kasper hired an attorney and Mr. Kasper and Jamie filed the present charges against Corley and Magnum on March 6, 2012. Depositions were taken of Shauwn and the defendants, which revealed the facts and circumstances leading up to and including — the death of Harry and the disposal of his body. This investigation ultimately identified the location and circumstances of his son’s death, which had been obstructed by the disposition and staging of Harry’s body.
Mr. Kasper has been depressed and angry regarding the treatment and disregard of his son’s deceased body and the specific actions taken to camouflage the circumstances of his death.[15]. He continues to dwell on how his son was found and the nature of his disposal, to the level where his depression and anger interrupts his ability to concentrate at work. Mr. Kasper attends group sessions for the loss of a child and actively participates in therapy for his loss. He also has started to work on charitable endeavors to help address his anger and depression. Moreover, Mr. Kasper expressed depression and anger specifically stemming from the actions of Corley because he personally knew Corley, and because Corley had the ability to contact Mr. Kasper and to advise him of his son’s death rather than staging and disposing of Hanys body.
Jamie Kasper expressed devastation from the fact that her younger brother’s dead body was left outside on the ground. Jamie reacted to this news with nausea. She expressed grief from the fact that Hanys life meant so little to the people who left him all alone on the ground. The grief and her own personal vision of her brother’s abandoned body continued to cause her distress.
In summary, the actions of Corley and Magnum were deliberate and planned. They both realized that Harry had passed away from an overdose. They knew that Harry’s body needed to be appropriately cared for. While they discussed calling 911, they excluded it as an option.[16]. Corley never told Magnum that he knew Hanys father, and Corley never discussed calling Mr. Kasper. Rather both Corley and Magnum planned a scheme for disposing of Harry’s body to protect their own personal interests. Magnum provided the means to remove the body by giving Corley a wheelchair to transport Harry’s body. Corley dressed Harry in a jacket and hat to obscure Harry’s appearance. Because they were not able to keep the body steadily upright in the chair, Corley used a rope to tie the body in a sitting position in the wheelchair. Even further, Corley wore one of Magnum’s hats to hide his distinctive mohawk haircut because he knew he “was doing something that looked pretty bad.” Corley and Magnum both brought the body in the wheelchair to the front entrance on Commonwealth Avenue. Corley then exited the front door and wheeled the body across the street.[17]. Magnum exited another door and went around the outside of his building in his motorized wheelchair. After Corley dumped Harry’s body against the back of a high-rise apartment building between two bushes on a Sunday afternoon, he scattered syringes about the body and tightly wrapped a shoelace around Harry’s right wrist in a tourniquet fashion. This was clearly meant to stage an overdose at the location and mask that the body had been dumped. Both Corley and Magnum returned to Magnum’s apartment building in the front door, timing their arrival within 60 seconds of each other. They had mutually completed their scheme to dump Harry’s body.[18].
The circumstances of this case were undoubtedly tragic for Mr. Kasper and Jamie. The actions that contributed to a night of heroin overdose and the ultimate death of Harry Kasper will permanently pain his family. However, this court is tasked with assessing the damages to the plaintiffs only from the disposal of Harry’s deceased body. Parsing the emotional damage to the family from the disposal of Harry’s body from all other events is a challenge that this court does not take lightly.
In evaluating the present claim of intentional infliction of emotional distress, the court concluded that under these particular circumstances, the unconscionable act was the disposal of Harry’s body, which intentionally deprived a father of the knowledge and the circumstances of his son’s death, by Corley who knew the special needs of Harry and the role of Mr. Kasper in the daily care of Harry. Corley knew this close relationship between Mr. Kasper and his son, and knew from his past experience that Mr. Kasper was the person to call and inform of Harry’s death. Corley knew that Harry had moved home to Newton with his father, and Corley knew from his past experience that Mr. Kasper would be looking for Hany. Corley also knew that Harry’s developmental needs and Mr. Kasper’s care of Harry would make Mr. Kasper even more emotionally distraught regarding the whereabouts of his son and the *626 circumstances of his son’s death. Corley acted in utter disregard of Mr. Kasper and his actions were deliberate and outrageous.
Unlike Mr. Kasper, there is no evidence to suggest that Corley knew Harry had a sister. The claim of intentional infliction of emotional distress is reserved only for acts that are intentionally or recklessly directed toward a particular person. Therefore, in the circumstances of this case, the deliberate and outrageous conduct by Corley was not intentionally directed in utter disregard of Harry’s sister, Jamie, because Corley had no knowledge of her and she was not within a sufficient contemporaneous knowledge of the event as required by law. Under these circumstances, an award of damages is precluded for IIED.
Regarding Magnum, there is no evidence that he knew either Mr. Kasper or Jamie. Although his conduct was deliberate and outrageous, in the circumstances of this case, Magnum did not perform these acts with the specific intent to act in utter disregard of Mr. Kasper or Jamie. Under these circumstances, an award of damages is precluded for IIED.
DISCUSSION
Case law distinguishes claims for IIED as against a direct victim and as against a third-party family member. See, e.g., North Shore Pharm. Servs. v. Breslin Assocs. Consulting, LLC, 491 F.Sup.2d 111, 134-35 (D.Mass. 2007). For a direct victim to establish a claim for IIED, a “plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant’s conduct was extreme and outrageous; (3) that the defendant’s conduct caused the plaintiffs distress; and (4) that the plaintiff suffered severe distress.” Sena v. Commonwealth, 417 Mass. 250, 263-64 (1994) (quoting Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1976)). Third-party family members may be able to recover for IIED claims where they can prove the above factors required for direct-IIED claims and additional elements, as the Supreme Judicial Court has cautiously and narrowly opened the door for such recovery. Nancy P. v. D'Amato, 401 Mass. 516, 521-22 (1988); see also Limone v. United States, 336 F.Sup.2d 18, 44 (D.Mass. 2004); Migliori v. Airborne Freight Corp., 426 Mass. 629, 631 (1998) (cautioning “every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit, legal consequences of wrongs to a controllable degree”).
Following the Restatement (Second) of Torts, the SJC recognizes “liability for intentionally or recklessly caused severe emotional distress of a family member who is present when extreme and outrageous conduct is directed at another family member.” Nancy P., 401 Mass. at 521-22. It also left open the possibility of liability attaching in other similar instances where a family member meets two elements: the relative has “(a) substantially contemporaneous knowledge of the outrageous conduct and (b) a severe emotional response.” id. at 522; see Limone, 336 F.Sup.2d at 45. This court has determined that Mr. Kasper established both elements with respect to Corley’s actions.[19]. This court will analyze each factor required to successfully prove an IIED claim in turn.
A. Intent to Cause Emotional Distress
The SJC has followed the Restatement (Second) of Torts in recognizing liability- “for intentionally or recklessly caused severe emotional distress of a family member.” Nancy P., 401 Mass. at 521-22 (emphasis added); see also Restatement (Second) of Torts, §46(2) & cmt. i (advising rule applicable where one “acts recklessly, as that term is defined in §500, in deliberate disregard of a high degree of probability that the emotional distress will follow”). Because liability may be imposed where an actor’s conduct was either intentional or reckless, assuming arguendo that the other factors are satisfied, one can be subject to liability where he intended to inflict emotional distress, or where he knew or should have known that emotional distress was a likely consequence. Nancy P., 401 Mass. at 520-22.
The Restatement defines recklessness as occurring either (1) when an actor “knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act,... in conscious disregard of, or indifference to, that risk,” or (2) when an “actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.” Restatement (Second) of Torts, §500. In either scenario, an actor is held to an objective standard and “he is held to the realization of the aggravated risk which a reasonable man in his place would have, [even if] he does not himself have it.” Restatement (Second) of Torts, §500. The second definition of recklessness applies to Corley’s actions here.
Since the SJC’s decision in Nancy R, courts have followed the SJC in applying the Restatement. See North Shore Pharm Servs., 491 F.Sup.2d at 113, 134-35 (allowing recovery by decedent’s spouse and daughter, where spouse and daughter lived with decedent during ongoing outrageous conduct by defendants that substantially contributed to decedent’s suicide); Anthony H. v. John G., 415 Mass. 196, 199 (1993) (applying analysis under Restatement from Nancy P. and declining to find liability- where no evidence of severe emotional distress); Cady v. Marcella, 49 Mass.App.Ct. 334, 343 (2000) (vacating dismissal of IIED claim where evidence present from which jury could determine defendants caused plaintiffs extreme emotional distress by physically seizing one-half of plaintiffs home in middle of winter).
While the SJC declined to award recoveiy to the victim’s mother and brother for IIED in Nancy P., the court did not reach the question of intent because the mother and brother lacked substantially contemporaneous knowledge of the event — which had occurred almost one year prior — and could not demonstrate adequately severe emotional distress caused by the outrageous conduct. *627 401 Mass. at 522-23. However, in noting the absence of any intent to cause emotional distress to the mother and the brother, the court recognized that “it would be a question for the trier of fact whether [the defendant] acted recklessly, indifferent to the likely effect of his conduct on family members who would be apt in time to learn of his outrageous conduct.” 401 Mass. at 521; see also North Shore Pharm. Servs., 491 F.Sup.2d at 134.
Corley spent many hours over a number of months with both Hairy and Mr. Kasper, regularly playing poker and discussing football together at EIKOS. Corley knew of Hany’s developmental difficulties by virtue of Harry’s residence at EIKOS. He also was well aware of the integral role that Mr. Kasper played in Hany’s life because of these difficulties, and of the increased involvement Mr. Kasper had when Harry was kicked out of EIKOS for agreeing to let Corley stay overnight.
A reasonable man in Corley’s position would have known that Mr. Kasper would have had heightened concern and distress over Hany’s whereabouts when Harry did not return home and did not answer his cell phone. Areasonable man in Corley’s position would have appreciated the fact that Mr. Kasper would be looking frantically for his son, including calling Harry’s cell phone and other friends. A reasonable man in Corley’s position simply would not have concocted a scheme to serve his own personal interests while simultaneously extinguishing Mr. Kasper’s ability to know the circumstances and location of Harry’s death. Holding Corley to an objective standard, he should have realized the exponentially increased risk of severe distress to Mr. Kasper, as a person that Corley knew well, would suffer as a result of dumping and staging Harry’s body.
Indeed, Corley took effort to disguise himself and certainly hoped that Mr. Kasper would not learn of his actions. However, the evidence clearly shows that Corley acted recklessly and indifferently with respect to the effect that disguising, transporting, and staging Hany’s body would have on Mr. Kasper, who was bound to learn of the outrageous conduct. See Nancy P., 401 Mass. at 520-22.
Conversely, Magnum never met Mr. Kasper nor did he know of the special relationship between Harry and his father. The facts lack any indication that Magnum had spent time with Harry prior to the night of Harry’s death. While Magnum’s role in devising the plan to move Harry out of his apartment and in providing the accoutrements that ultimately enabled Corley to complete the transportation of Harry’s body is deplorable and outrageous, he lacked any additional knowledge of Mr. Kasper and Harry suggesting the heightened risk of distress that Mr. Kasper would ultimately suffer. Thus, Mr. Kasper cannot recover here as against Magnum.
This court is mindful and sensitive to the suffering of Harry’s sister in learning of her brother’s death. However, the evidence presented does not suggest that Corley or Magnum knew that Hairy had a sister or knew of another familial relationship with Hairy that mirrored Hany’s relationship with his father, of which Corley was well-aware. Without such knowledge, neither Corley nor Magnum can be said to have acted in utter disregard of Jamie or her relationship with Hairy. Without such specific or reckless intent present here, Jamie cannot recover as against Corley or Magnum.
B. Extreme and Outrageous Conduct
To qualify as “extreme and outrageous,” an actor’s conduct must go “beyond all possible bounds of decency,” and be “regarded as atrocious, and utterly intolerable in a civilized community.” Polay v. McMahon, 468 Mass. 379 (2014) (quoting Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987)); see Agis, 371 Mass. at 145. Though the word “outrageous” itself is “somewhat debased in current usage,... as employed in the Agis opinion it meant more than workaday insults, annoyances, or even threats and petty oppressions ... It means, for example, a high order of reckless ruthlessness or deliberate malevolence that, as the Agis and Foley opinions say, is simply intolerable.” Parker v. Bank of Am., N.A., 2011 Mass.Super. LEXIS 270 at *39 (Mass.Super.Ct. 2011) [29 Conn. L. Rptr. 194] (quoting Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994)). Nonetheless, the high standard that a plaintiff must satisfy to prove their claim requires demonstrating that an actor’s conduct involves more than “mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.” Polay, 468 Mass. at 385 (internal quotations and citations omitted).
Corley and Magnum’s plan and subsequent conduct in furtherance of their scheme to dispose of Hany’s body was extreme and outrageous and of an order suggesting such “reckless ruthlessness” contemplated in Conway. In light of Corley’s familiar histoiy with Harry and Mr. Kasper and the nature of their relationship, Corley, at the veiy minimum, should have known that his actions would cause severe emotional distress to Mr. Kasper regarding the disposal of his son’s body and deprive him of not knowing the accurate circumstances of his son’s death.
The deliberate disguise of a dead body, transportation of the body in a surreptitious manner as to evade discovery, and staging with additional props to suggest alternative conditions of death is beyond the bounds of decency. The disposal of Harry’s body and the deprivation to Mr. Kasper of knowing whether Harry died alone or with others, at the site where his body was discovered or elsewhere, and not knowing the circumstances of Hany’s death is reckless ruthlessness that eviscerates all common decency toward Mr. Kasper. Compare Nancy P., 401 Mass at 520-21 (opining jury would have determined defendant-neighbor’s sexual abuse of plaintiff child constituted extreme and outrageous conduct); Simon v. Solomon, 385 Mass. 91, 95, 97 (1982) (finding outrageous conduct where landlord continuously failed to relieve flooding problem which resulted in water and sewage entering tenant’s apartment); Boyle v. Wenk, 378 Mass. 592, 595 (1979) (finding repeated harassment constituted extreme and outrageous conduct because it *628 could “reasonably be viewed as an attempt to intentionally shock and harm a person’s peace of mind’ by invading the person’s mental or emotional tranquility”); Bresnahan v. McAuliffe, 47 Mass.App.Ct. 278, 282-83 & n.5 (1999) (finding sufficient evidence of out-rageousness where defendant’s actions caused plaintiffs stillborn baby’s body to become horribly disfigured and where entirety of defendant’s actions either “intentionally callous or incredibly insensitive”), with Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466-67 (1997) (determining that even if law firm’s drafting of will was negligent, insufficient evidence to support finding of extreme and outrageous conduct); Kelly v. Brigham & Women’s Hasp., 51 Mass.App.Ct. 297, 298 (2001) (finding no outrageous conduct where doctor’s autopsy more invasive than scope of autopsy that decedent’s wife had agreed to because no evidence that doctor recklessly misled wife or had actual knowledge that autopsy would be so intrusive, and doctor believed decedent would have wanted full autopsy performed to ascertain precise nature of his disease); Quinn v. Walsh, 49 Mass.App.Ct. 696, 707-08 (2000) (openly conducted extramarital affair did not constitute outrageous conduct). Cf. Richardson v. Liberty Mut. Fire Ins. Co., 47 Mass.App.Ct. 698, 701 (1999) (“Whether the callous dumping of a dead body in a place where it was highly likely to be discovered by the deceased’s immediate family is conduct so extreme and outrageous as to warrant an inference of intent to harm as matter of law is a novel question”).
C. Causation
For the court to impose liability as to Corley, Mr. Kasper must also show that Corley’s conduct caused his emotional distress. Sena, 417 Mass. at 263-64; Agis, 371 Mass. at 145. Because this is a case where Mr. Kasper seeks to recover as a third-party family member of Harry, he must also show that he had substantially contemporaneous knowledge of the outrageous conduct. Nancy P., 401 Mass. at 522.[20].
It is well-settled in Massachusetts that “[e]motional distress is the natural and proximate result of knowing that the remains of a deceased family member have not been preserved as the family desired.” Kelly, 51 Mass.App.Ct. at 307, and authorities cited; see also Prosser & Keaton, Torts §54, at 362 (5th ed. 1984). While Mr. Kasper would unquestionably become distressed upon learning that his son passed away under any other myriad of circumstances, the added mistreatment of Harry’s body and the staging of the circumstances surrounding his death heightened his distress. Not knowing what Harry had been doing at the time of his death, with whom he had been in the company of, if anyone, the location of where he actually passed away, and the reason for his untimely death, taken together with the especially close relationship between Harry and Mr. Kasper, understandably enhanced the grief and emotional distress Mr. Kasper experienced and continues to suffer.
1. Substantially Contemporaneous Knowledge of the Outrageous Conduct
Mr. Kasper did not know of Harry’s death at the precise moment it occurred. He was not present at the place where Harry passed away. Nor did Mr. Kasper personally discover Harry’s body or happen upon the scene where events that led to Harry’s death and subsequent transportation of his body unfolded. However, Mr. Kasper suspected that something was amiss when Harry never returned home after his planned dinner with friends. Mr. Kasper’s suspicions increasingly mounted as the evening faded into the following morning, without Harry answering his cellphone and without any of Harry’s friends being able to tell Mr. Kasper of Harry’s whereabouts.[21].
The SJC has recognized the possibility of recovery by a parent for outrageous conduct that was intentional or reckless and that caused the parent extreme distress, even though the parent was not present at the scene of the conduct. Nancy P., 401 Mass. at 522. The unique, albeit disconcerting, facts of this case present a compelling situation for allowing such recovery in the absence of a parent’s physical presence at the location and time of the wrongful conduct. Nancy P., 401 Mass. at 520-22 (internal citations omitted) (“Where the wrongful conduct is intentional or reckless, we might be even less inclined to make a parent’s physical presence an essential element of liability”).
This court’s determination that Mr. Kasper meets this knowledge requirement does not erode case precedent regarding the amount of time that can be considered as substantially contemporaneous because such a determination directly correlates with the unique facts of each case. See North Shore Pharm. Servs., 491 F.Sup.2d at 122-23 (determining substantially contemporaneous knowledge element met where wife discovered husband’s dead body hanging in home garage after husband committed suicide sometime earlier that day); Nancy P., 401 Mass. at 522 (advising that mother’s learning of defendant’s sexual assault of daughter one year after the last incident not substantially contemporaneous); Zachary v. Centrus Premier Home Care, 1999 Mass.Super. LEXIS 492 at *6 (Mass.Super.Ct. 1999) [10 Conn. L. Rptr. 738] (holding plaintiffs’ learning about father’s nurse’s failure to administer father’s pain medications one day after it occurred not substantially contemporaneous). The staging and transport of Harry’s body was an ongoing event, meant to be evasive and to cloud a swift determination of the circumstances of Harry’s death. Mr. Kasper, frantically engaged in his own efforts to find Harry, arguably learned of the circumstances of Harry’s death thanks to a passerby and the police, sooner rather than later; if the weather had been less than sunny, or had it been a different time of day or a workday rather than a Sunday, it could have taken much longer for Mr. Kasper to learn these circumstances. This court is satisfied that the timeline comports with the substantially contemporaneous knowledge element. Further, it is aligned with the *629 spirit behind recognizing the tort for IIED at all, which specifically provides a narrowly defined means of recovery for conduct that is utterly intolerable in a civilized community. See Agis, 371 Mass. at 145.
Mr. Kasper learned of the location and condition of Harry’s disposed, deceased body from the police, who discovered the body based on a call from passerby, approximately one hour and fifteen minutes after Corley and Magnum had wheeled Harry’s body out of Magnum’s apartment. The focus here is on the disposal of Harry’s body resulting from Corley’s conduct, to wit, moving the body from its original location with the intent to conceal the original circumstances of Harry’s death. It is clear to this court that Mr. Kasper had sufficiently substantial contemporaneous knowledge of Corley’s conduct because he was actively searching for Harry, who had not been where he was originally supposed to and was missing for many hours, and learned of the news from the police on the same afternoon that Corley disposed of Harry’s body. The time frame between Corley and Magnum’s egregious conduct and Mr. Kasper’s learning of the circumstances of the concealed disposition of Harry’s body satisfies this requirement. See North Shore Pharm. Servs., 491 F.Sup.2d at 122-23, 134.
In some instances, where courts have analyzed the substantially contemporaneous knowledge factor, they have often declined to give it great weight in light of the high bar set by the other elements for an IIED claim. In Nancy P., while the court ultimately did not permit recovery, it explained that it placed “little stress on the absence of substantially contemporaneous knowledge,” because the defendant told the victim to keep his conduct secret. 401 Mass. at 522. The Quinn court also recognized that in cases where the harmful conduct is “inherently unknowable” that the court need not weigh this factor in its analysis. 49 Mass.App.Ct. at 699.
Here, the actions comprising Corley’s disguising, transporting, and staging of Harry’s disposed body were inherently unknowable to Mr. Kasper. Corley never phoned Mr. Kasper or the authorities, who would have relayed the news to Mr. Kasper. Nor did Corley, as a reasonable friend could have, answer any of the missed incoming calls that Mr. Kasper made to Harry’s cell phone or bother to call Mr. Kasper himself. Corley, in disguising his own appearance while disposing of Harry’s body, actively endeavored to conceal his conduct just as the defendant in Nancy P. had done. 401 Mass. at 522; Limone, 336 F.Sup.2d at 45 n.39 (“goal of limiting fraudulent claims and an expansive plaintiff class does not comport with denying rightful claims for outrageous behavior that was concealed intentionally from the plaintiff’). Indeed, Corley went so far as to tell Shauwn on the day after disposing of Harry’s body not to tell anyone that Corley had been at Magnum’s apartment because Harry “may” have overdosed. The active concealment of the circumstances of Harry’s death indicate to this court that this factor should not be given great weight, but even if it were a substantial element, Mr. Kasper would satisfy it.
D. Severe Emotional Response
“Unlike cases involving negligently inflicted emotional injuries, [the SJC] has, from early on, allowed recovery for intentional or reckless inflictions of emotional injuries even in the absence of attendant physical harm.” North Shore Pharm. Servs., 491 F.Sup.2d at 134-35 (quoting Migliori, 426 Mass. at 632 n.2). This court is persuaded that Mr. Kasper has alleged severe emotional distress, beyond simply reciting the element. Cf. Galiastro v. Mortgage Elec. Registration Sys., Inc., 467 Mass. 160, 174 (2014); Agis, 371 Mass. at 145. When a close family member suffers serious mental anguish from learning of damage to a deceased’s remains, “the special circumstances serve as a guarantee that the claim is not spurious.” Prosser & Keeton, Torts §54, at 362 (5th ed. 1984). “Emotional distress is the natural and proximate result of knowing that the remains of a deceased family member have not been preserved as the family desired.” Kelly, 51 Mass.App.Ct. at 307.
Mr. Kasper presented evidence showing his distress at being unable to ascertain the circumstances of his son’s death,[22], explaining how he continues to suffer from depression and anger. He explained how he continues to dwell on the treatment and utter disregard of Harry’s body by someone whom Mr. Kasper knew. His depression and anger prevent him from concentrating at work. Despite attending group therapy sessions, he continues to lament the fact that Corley, as someone who had the ability to contact him directly to advise him of the circumstances of his son’s death, chose not to do so and deprived him of knowing precisely how and when his son died.
While cases involving a deceased’s remains often discuss emotional distress in the context of negligent, rather than intentional, infliction of emotional distress, they are instructive as to the burden one must satisfy to indicate severe emotional distress in cases involving emotional harm from the treatment of a deceased. See Kelly, 51 Mass.App.Ct. at 307 (permitting recovery for injury to feelings); Burney v. Children’s Hosp., 169 Mass. 57, 59-60 (1897) (allowing survivors to recover for mental distress when corpse of loved one is subject to unwanted autopsy); see also Meagher v. Driscoll, 99 Mass. 281, 284-85 (1868) (allowing jury to consider injury to plaintiffs feelings when measuring damages in cases involving unlawful removal of a body).
In the Bresnahan case, the court permitted the plaintiff parents to proceed to trial on an IIED claim because their evidence showed a reasonable expectation of proving that the defendant’s outrageous conduct “had a severe and traumatic effect upon their emotional health.” 47 Mass.App.Ct. at 283. As part of their anticipated evidence, plaintiffs evidenced crying spells, depression, loss of concentration, anger, anxiety, and their attendance of group grief counseling sessions. Id. at 282-83. During the jury-waived trial here, while Mr. Kasper did not present equally intense evidence of emotional distress as the Bresnahan plaintiffs, he more than ade *630 quately indicated a level of emotional distress from the dumping and staging of his son’s deceased body to easily satisfying his burden on this factor.[23].
ORDER OF JUDGMENT
For the foregoing reasons, it is ORDERED:
JUDGMENT shall enter for plaintiff James Kasper as against Defendant Henry Corley on the complaint for Intentional Infliction of Emotional Distress in the amount of $50,000.
JUDGMENT shall enter for defendant Richard Magnum as against plaintiff James Kasper on the complaint for Intentional Infliction of Emotional Distress.
JUDGMENT shall enter for the defendants Henry Corley and Richard Magnum as against plaintiff Jamie Kasper on the complaint for Intentional Infliction of Emotional Distress.

 It is clear from the evidence that Corley had a history of drug abuse and that he was a heroin addict in April 2011.

 On this evening, Corley, Shauwn and Harry had their own cell phones. It is a reasonable inference that Corley used Shauwn’s cell phone to call Harry, because his number had been blocked by Mr. Kasper and Shauwn testified that Corley may have used his cell phone on that evening.

 The evidence showed that Corley and Magnum knew each other from the neighborhood. It is a reasonable inference from the evidence that Corley seemed to roam the area. The evidence showed that Corley periodically went and used Magnum’s apartment, and that Harry had been there on two prior occasions. There is no indication that Shauwn had been there before, but he also knew Magnum from the neighborhood.

 It is unclear whether Magnum was watching television programming or videos. Nonetheless, he was using a television for his viewing.

 Corley testified that Hany wanted to do a whole bag of heroin and Corley “begged” him not to. Regardless of what the conversation may have been, Harry overdosed on heroin that was bought by Corley with Harry’s money.

 On April 11, 2011 — the day after Corley disposed of Harry’s corpse — Corley called Shauwn to instruct him not to tell anyone that Corley was present at Magnum’s apartment because Harry “may” have overdosed.

 Corley had a Mohawk haircut at the time. Corley wore this hat to obscure his identity Corley acknowledged that he used Magnum’s hat to disguise his Mohawk haircut because he knew he “was doing something that looked pretty bad.”

 A rope was lying in the seat of the wheelchair.

 The preceding events were recorded on hallway/elevator video cameras at Magnum’s apartment building.

 The Medical Examiner’s report gave this description, which would reasonably infer that Corley wrapped the shoelace at the time he staged the body. A tourniquet would not have been on the body throughout the night

 here is no evidence to suggest that Magnum was aware that Corley had staged the body with syringe needles.

 There was no evidence that placed Magnum at the scene of the disposed body.

The charges in the District Court took approximately one year for resolution. Mr. Kasper expressed frustration with the length of the court process. He also thought that the penalties and fines for improperly disposing a body did not sufficiently address the wrongdoing in this particular matter. This court is sensitive to the needs for parties to reach resolution in both criminal and civil proceedings. However, for purposes of clarity in this decision, it is worth noting that the process of litigating criminal charges within the judicial system is not grounds for a claim of intentional infliction of emotional distress. Similarly criminal penalties and fees are within the jurisdiction of the legislative branch of government. Dissatisfaction with legislated penalties cannot be attributable to causation or damages for intentional infliction of emotional distress.

 As previously footnoted, Corley called Shaun and learned that Mr. Kasper was seeking information about Harry’s death. Corley told Shauwn not to tell him that Corley was present.

 It was clear from the testimony of both plaintiffs that they blamed Corley for Harry’s use of heroin and overdose death. However, the evidence at trial distinguished those beliefs, from evidence presented regarding the disposition of Harry’s body and the claim for intentional infliction of emotional distress from the dumping and staging of Harry’s body — which is the basis of the claim in this matter.

 Magnum testified that he had suggested that Corley bring the body to the fire department. The testimony is not necessary to consider because it is obvious that Corley did not take that action. Anyone delivering a dead body to a fire department would be required to give some level of explanation, and Corley would not have been able to return to Magnum’s apartment in 6-7 minutes, as happened in this matter.

 1960 Commonwealth Avenue, where the body was found, is across the street from 1925 Commonwealth Avenue.

 It would have been obvious to Magnum that the body had been discarded because the wheelchair was empfy.

 The focus of this discussion is on Mr. Kasper and Corley. Jamie, for reasons discussed infra, is precluded from recovering under an IIED claim as against either defendant. Magnum, as also discussed infra is not subject to liability here because the facts do not satisfy the necessary intent for an IIED claim.

 Even if the intent to cause emotional distress to Jamie existed, her recovery would be limited under the substantially contemporaneous knowledge element. Nothing indicates she was aware that Harry had not met his friends for dinner that evening nor any knowledge that Harry had not returned home that evening. The record is unclear as to precisely when she learned that Harry was missing, and when, on the day that police found Harry’s body, she learned that Harry’s body had been found.

 The facts here also address the SJC’s concerns about applying the substantially contemporaneous requirementbe-cause no expansive class of plaintiffs exists, nor is Mr. Kasper’s claim frivolous or contrived. See Limone, 336 F.Sup.2d at 45, see also Migliori, 426 Mass. at 631.

 Initially, Mr Kasper was notified by police of his son’s death, and the police response that found Harry’s body. A further police investigation identified Corley and Magnum as the individuals involved in the disposal of Harry’s body. Ultimately, it was the private investigation pursuant to this action that identified the location and circumstances of his son’s death, which he had been deprived of through the dumping and staging of Harry’s body.

 The court notes that Mr. Kasper did not produce any evidence of medical bills, treatment records, or other costs associated with his extreme emotional distress. While the court does not require such documentation of treatment of physical harm for an action in IIED, establishing a fair basis for damages in this matter is not aided by such records.